**Richard L. WATERS, Appellant,**

v.

**Richard THORNBURGH, Appellee.**

No. 88–5178.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 25, 1989.

Decided Oct. 31, 1989.

Joseph B. Scott, with whom Jennifer R. Levin, Washington, D.C., was on the brief, for appellant.

Wilma A. Lewis, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before WALD, Chief Judge, and BUCKLEY and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Richard Waters sued his employer, the Department of Justice ("Department"), for damages[1] for an alleged violation of his rights under subsection (e)(2) of the Privacy Act ("the Act"). 5 U.S.C. § 552a.[2] On cross-motions for summary judgment, the district court ruled in favor of the Department. *Waters v. Meese*, 684 F.Supp. 712 (D.D.C.1988). The court found that the Department had not violated the Act when it sought information from a third party about Waters' whereabouts during a period of time for which he was on annual leave, and that, in any event, the Department's conduct was not "intentional or willful." Because we find as a matter of law that the Department did not "to the greatest extent practicable" obtain information from Waters, we reverse the grant of summary judgment in favor of the Department, and grant partial summary judgment for Waters on the practicability issue. We also find that Waters raised a triable issue of fact concerning whether the Department's conduct rose to the level of an intentional or willful violation, and remand on that issue.

## I. BACKGROUND[3]

Richard L. Waters is a Department of Justice employee who at all times relevant to this action served as a Senior Program Analyst in the Coordination and Review Section of the Civil Rights Division. In early February 1986, Waters filed a request for a combination of sick leave, annual leave, and advanced annual leave for the period February 4, 1986, through February 26, 1986, for the purpose of preparing for and taking the Pennsylvania bar exam. Waters' supervisor, James Bennett, approved his use of annual and advanced annual leave for this purpose.

Waters returned to work as scheduled on February 27. On or about February 28, Waters requested and received administrative leave from Bennett to satisfy a summons for jury duty from March 3, 1986, through March 14, 1986, in the United States District Court for the District of Columbia. This leave was later extended through March 21.

When Waters did not return to work as scheduled on March 24, Bennett asked Joyce Burch, the timekeeper, to make an inquiry. She reported to Bennett that Waters was still serving on a jury, but that the jury commissioner indicated that he had not actually begun sitting until March 11. When Waters returned, and after consulting with his own supervisor and with the Chief of the Administrative Management Section ("AMS"), Bennett asked Waters to account for his actual use of administrative leave on the days between March 3 and March 11. Waters responded that he had been at his office on all but two of those days. When further investigation did not fully corroborate Waters' story, Bennett again contacted the jury commissioner. This time, she indicated that Waters had asked her to certify his presence for jury duty during days in which her records did not reflect that he was present, and which

1. Waters' complaint also asked for injunctive relief in the form of an order to the Department of Justice to take steps to prevent further violations of the Privacy Act. Appellant's Original Complaint, at 4. The district court did not address this aspect of Waters' claim, and it was not raised on appeal.

2. The Privacy Act of 1974, 5 U.S.C. § 552a(e)(2) provides as follows:
   (e) *Agency Requirements.* Each agency that maintains a system of records shall—(2) collect information to the greatest extent practicable directly from the subject individual

when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs.

3. As the district court noted, the parties do not dispute the underlying facts as alleged, but only their relevance to the case. *See Waters v. Meese*, 684 F.Supp. 712, 713 & n. 1; Plaintiff's Memorandum in Opposition to Defendant's Cross–Motion for Summary Judgment and in Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment, at 1 n. 1.

included the period Waters had claimed to be at his duty station.

According to Bennett, he then also became suspicious about Waters' use of annual leave in February, and requested that the Chief of the AMS contact the Pennsylvania Board of Law Examiners ("the Board"). In May 1986, the AMS Chief asked Kathleen Murphy, then Chief of the Personnel and Training Unit of the Civil Rights Division, to investigate Waters' use of administrative leave, and to contact the Pennsylvania Board. In early July 1986, Murphy telephoned the Board to request confirmation of Waters' attendance at the February bar exam. The Board told Murphy that any such request had to be in writing, and that disclosure to a third party would only be made if the letter contained a persuasive demonstration of need for the information. In response, Murphy sent the letter at issue in this appeal. In relevant part, the letter said:

> For reasons that I cannot disclose at this time, his supervisor has reason to believe that Richard Waters did not take the bar at this period of time. If this is in fact the case, his supervisor intends to take some form of disciplinary action which could possibly lead to his removal from federal service.

On July 21, the Board confirmed that Waters had taken the February bar exam. During the course of these events, Waters was never informed that the Department was also investigating his use of leave in February. He found out in December 1986, in unrelated correspondence with the Board. On December 24, in response to a request from Waters' attorney, the Department sent Waters copies of the Department's correspondence with the Pennsylvania bar authorities. It also sent him a copy of a letter (dated December 24) from the Executive Officer of the Administrative Management Section of the Civil Rights Division to the Pennsylvania Board explaining that Murphy's July 9, 1986, letter had been simply an attempt to verify Waters' attendance at the bar exam. The letter

further stated that Waters was and always had been in good standing as a federal employee.

Waters filed suit against the Department claiming that it had violated subsection (e)(2) of the Privacy Act because it failed to "collect information to the greatest extent practicable directly from the subject individual" by contacting the Pennsylvania bar authorities without first asking him to provide objective verification of his attendance at the bar exam. 5 U.S.C. § 552a(e)(2). The parties filed cross-motions for summary judgment.

In a memorandum opinion and order filed April 25, 1988, the district court denied Waters' motion for summary judgment, and granted the Department's cross-motion largely on the ground that the Department had reasonable grounds for doubting Waters' credibility and was, therefore, justified in seeking information directly from the Pennsylvania Board. *Waters v. Meese*, 684 F.Supp. 712 (D.D.C.1988). On appeal, Waters argues that mere doubts about a subject's credibility cannot relieve an agency's subsection (e)(2) obligation to obtain information first from that subject; and, that the recklessness with which the Department proceeded in sending the letter to the Pennsylvania Board should satisfy the "intentional or willful" standard.

## II. DISCUSSION

To obtain relief under subsection (e)(2) of the Privacy Act, 5 U.S.C. § 552a(e)(2), a plaintiff must establish that: (1) the agency failed to elicit information directly from him "to the greatest extent practicable," 5 U.S.C. § 552a(e)(2); (2) the violation of the Act was "intentional or willful," 5 U.S.C. § 552a(g)(4); and (3) this action had an "adverse effect" on the plaintiff, 5 U.S.C. § 552a(g)(1)(D). If these three factors are satisfied, the plaintiff is entitled to the greater of $1,000 or the actual damages sustained. 5 U.S.C. § 552a(g)(4). Only the first two requirements are at issue in this appeal.[4]

---

**4.** In the district court, the Department argued that Waters had failed to satisfy the "adverse

effect" prong of this action. Brief for Appellee, at 8 n. 6. Since the district court did not ad-

Summary judgment is only appropriate "where 'the evidence is such that a reasonable jury could not return a verdict for the nonmoving party.'" *Washington Post Co. v. U.S. Dept. of Health and Human Services,* 865 F.2d 320, 325 (D.C.Cir.1989), quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party must first meet its burden of production by showing the absence of a genuine issue of fact. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the motion for summary judgment is properly supported, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Laningham v. U.S. Navy,* 813 F.2d 1236, 1241 (D.C.Cir. 1987); *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. The nonmoving party cannot satisfy this burden by resting on mere allegations, but instead must present "'affirmative evidence' showing a genuine issue for trial." *Laningham,* 813 F.2d at 1241, quoting *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. at 2514. Therefore, to survive the government's properly-supported motion, the plaintiff must set forth evidence that would allow a "reasonable jury [to] return a verdict" in his favor. *See Laningham,* 813 F.2d at 1241; *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Frito-Lay, Inc. v. Willoughby,* 863 F.2d 1029 (D.C.Cir.1988). In light of these requirements, we will discuss the appropriateness of the district court's summary resolution of the practicability and intent issues.

## A. *"To the Greatest Extent Practicable"*

The district court found that the government had met its initial burden on summary judgment to show the absence of a genuine issue of material fact on the practicability issue. The Department presented affidavits to show that the supervisors involved had reasonable grounds for doubting Waters' credibility, and, therefore, reasonably believed that it was impracticable to obtain information directly from him. *Waters v. Meese,* 684 F.Supp. at 715. The burden then shifted to Waters, who presented evidence to show the existence of objective documentary proof of his attendance at the bar exam. Waters argued not that such evidence raised a genuine issue of material fact, but that it showed as a matter of law that the Department did not "to the greatest extent practicable" obtain information from him. Though the district court found this argument "not without appeal," it found it unpersuasive.

■ We disagree.[5] The court assumed that justifiable grounds for doubting Waters' credibility translated into impracticability for Privacy Act purposes. In the context of an investigation that is seeking objective, unalterable information, reasonable questions about a subject's credibility cannot relieve an agency from its responsibility to collect that information first from the subject.[6] The answer to the Department's inquiry in this case did not turn on Waters' credibility.

Nor is fear of witness tampering pertinent to this case, despite the government's

dress this issue, it was not raised on appeal. Neither party briefed the issue of damages. *Id.* at 8 n. 6.

**5.** The district court relied for support on two unpublished opinions which involved investigations of IRS agents. *See Waters v. Meese,* 684 F.Supp. at 715, discussing *Alexander v. IRS,* Civ. Action No. 86–0414, 1987 WL 13958 (D.D.C. June 30, 1987) and *Merola v. IRS,* Civ. Action No. 83–3323 (D.D.C. Oct. 24, 1986); *see also* Brief for Appellee, at 15. Even if we could rely on such unpublished opinions as precedent, *see* D.C.Gen. Rule 11(c), we note that these cases do not arise in the same context as the *Waters* case. Both of them involve allegations against IRS agents, who could potentially coerce witnesses

into giving false testimony if the agency tipped its hand in its investigation. Moreover, *Alexander* turned on the intentional or willful element of the claim, and adds nothing to this court's clearly-established precedent on that issue; *Merola* turned on plaintiff's failure to show "adverse effect," an element not at issue in this case.

**6.** We do not accept the Department's characterization of its contact with the Pennsylvania Board as an attempt to verify information Waters had already provided. *See* Brief for Appellee, at 16–17. If that were the case, then any federal employee who fills out an annual leave request would essentially be waiving his subsection (e)(2) rights under the Privacy Act.

argument to the contrary. As Waters argued, "bar examination proceedings are uniquely immune" to attempts at witness influence. Reply Brief for Appellant at 11. The government argued that Waters' questionable credibility coupled with the proximity between Waters' possible impropriety in the use of his jury leave and his bar exam leave made it additionally impracticable to go first to Waters for the information. These factors, however, cannot justify failing to go first to Waters for objective proof of his bar attendance, proof such as written correspondence informing him of his bar results, and his bar exam admittance ticket. *Waters,* 684 F.Supp. at 715 (acknowledging that Waters retained these documents).

These conclusions are not inconsistent with this court's recent decision in *Brune v. IRS,* 861 F.2d 1284 (D.C.Cir.1988). There, for the first time, this court dealt with a case arising under subsection (e)(2). In *Brune,* an IRS supervisor became suspicious about an agent's travel expense vouchers, particularly relating to multiple visits to two taxpayers. He contacted those taxpayers to check on the agent's visits to them. The supervisor then interviewed the agent. The court affirmed the district court's grant of summary judgment for the IRS, finding that it was impracticable as a matter of law for the agency to collect the information it needed directly from Brune.

Despite some facial similarity in the investigations at issue in these two cases, the *Brune* court relied heavily on the special nature of the investigation in that case—possible false statements by an IRS agent. It said, "[an IRS agent's] ability to coerce [taxpayer witnesses], and their incentive to avoid alienating him, substantially heighten the risk of biasing the only witnesses who may be able to provide first-hand information to the investigator." *Brune,* 861 F.2d at 1287–88. The investigators in this case could not reasonably have thought that Waters would be able to falsify or secrete evidence having to do with his attendance at the Pennsylvania bar exam. As we explain in *Brune,* "[T]he relevant inquiry under section (e)(2) concerns, as it must, the reasonableness of the investigator's decision to contact a third party viewed at the time it was made." *Brune,* 861 F.2d at 1288. Nor could they have believed Waters could exert pressure over the bar authorities to force them to alter their responses to the Department's inquiry. If he had been unable to produce satisfactory objective proof of his attendance, then the Department would not have violated the Privacy Act by attempting to obtain the information directly from the Pennsylvania Board.

Our analysis is also consistent with the legislative history of this provision of the Privacy Act. The section was designed to "discourage the collection of personal information from third party sources and therefore to encourage the accuracy of Federal data gathering." *Analysis of House and Senate Compromise Amendments to the Federal Privacy Act,* 120 Cong.Rec. 40,-405, 40,407 (1974) (*"Staff Analysis"*), *reprinted in* Legislative History of the Privacy Act of 1974, at 991 (1976) (*"Sourcebook"*). The government relies on this language to justify its decision to go directly to the Pennsylvania Board as the best way to ensure the accuracy of the information it sought. The point of the provision, however, is not to give the agency the option of choosing which source—the subject of the investigation or some third party—would provide the most accurate information; rather, it reflects congressional judgment that the best way to ensure accuracy in general is to require the agency to obtain information "directly from the individual whenever practicable." OMB Privacy Act Guidelines, 40 Fed.Reg. 28,949, 28,961 (1975) ("OMB Guidelines"); *see also* DOJ Regulations Implementing the Privacy Act of 1974, 28 C.F.R. § 16.57(b)(3).[7]

7. The OMB Guidelines list several practical considerations that should be considered by agencies where they propose to collect information from a third party source: the nature of the program (where the information can only be obtained from third parties, as in criminal investigations); the costs; the risk that the information to be collected from the third party, if inaccurate, could result in an adverse determination; the need to insure the accuracy of infor-

Moreover, the Act is fundamentally concerned with privacy. It supports "the principle that an individual should to the greatest extent possible be in control of information about him which is given to the government ... a principle designed to insure fairness in information collection which should be instituted wherever possible." *Staff Analysis,* 120 Cong.Rec. at 40,407, *reprinted in Sourcebook* at 991. These concerns could have been optimally satisfied in this case had the Department asked Waters to verify his attendance at the February bar exam.

This discussion demonstrates that no genuine issue of material fact remains as to this practicability issue. As a matter of law, we conclude that the district court erred in granting the Department's motion and denying Waters' cross-motion. The Department's doubts about Waters' credibility cannot overcome the ease with which the Department could have satisfied its Privacy Act obligation to collect the information about Waters' bar attendance "to the greatest extent practicable" from Waters himself. We, therefore, reverse on this issue.

### B. *"Intentional or Willful" Conduct*

■ Even though we find that the Department's conduct violated the Privacy Act, Waters cannot recover damages unless the "agency acted in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4). The district court found that Waters had not established a genuine issue of material fact as to the intentional or willful nature of the Department's actions. Instead, the district court said, the evidence showed only "bad judgment" on the Department's part, and therefore, could be resolved against Waters on summary judgment. *Waters v. Meese,* 684 F.Supp. at 716. While the Department's conduct may

well ultimately be found to reflect bad judgment, for the following reasons, we also believe that a reasonable jury could find that such conduct "flagrantly disregarded" Waters' rights under the Privacy Act. *See Albright v. United States,* 732 F.2d 181, 189 (D.C.Cir.1984) (*"Albright II"*).

The legislative history of the Privacy Act describes the intentional or willful standard in the following manner: "On a continuum between negligence and the very high standard of willful, arbitrary, or capricious conduct, this standard is viewed as only somewhat greater than gross negligence." *Staff Analysis,* 120 Cong.Rec. at 40,406, *reprinted in Sourcebook,* at 990. This court has articulated the standard for Privacy Act purposes as "somewhat greater than gross negligence," *Hill v. U.S. Air Force,* 795 F.2d 1067, 1070 (D.C.Cir.1986) (*citations omitted*), or, an act committed "without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act." *Albright II,* 732 F.2d at 189.

As the district court correctly noted, this court and others have been willing to decide issues of intent and willfulness under the Privacy Act standard at the summary judgment stage. *See, e.g., Moskiewicz v. Dept. of Agriculture,* 791 F.2d 561 (7th Cir.1986); *Perry v. Block,* 684 F.2d 121 (D.C.Cir.1982); *see also Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. at 2514; *Laningham v. U.S. Navy,* 813 F.2d 1236, 1241 n. 6 (D.C.Cir.1987) (summary judgment rules apply equally when the issue in dispute involves a party's state of mind). Parties opposing summary judgment for the defendant on the intent issue have not prevailed where they have merely presented evidence that the government acted negligently, *see Moskiewicz v. U.S. Dept. of Agriculture,* 791 F.2d 561 (7th Cir.1986), or that the government handled a matter in a disjoint-

---

mation supplied by an individual; and, once the agency has determined that it was not practicable to obtain the information from the subject, the provisions for verifying that third-party information with the individual. OMB Guidelines, 40 Feg.Reg. 28,961 (1975). Had the Department weighed these factors in this case, it would have had to conclude that the nature of

the information sought, the low cost, the risk to Waters if the Pennsylvania Board had somehow made an error and provided inaccurate information, and the low risk of Waters himself being able to falsify the information made it "practicable" to go first to Waters to obtain the information.

ed, or confused manner, *see Perry v. Block*, 684 F.2d 121 (D.C.Cir.1982), or that the government acted "inadvertently [to] contravene" the Act, *see Albright II*, 732 F.2d at 189. *See also White v. Office of Personnel Management*, 840 F.2d 85 (D.C. Cir.1988) (plaintiff failed to make out a genuine issue of material fact where he showed only that the agency made a decision adverse to him that was within its discretion to make). Similarly, in *Laningham*, the plaintiff was unable to establish a genuine issue of material fact where the Navy had acted first to place the documents in question under seal, and subsequently acted pursuant to a court order. 813 F.2d at 1243.

In *Tijerina v. Walters*, 821 F.2d 789 (D.C.Cir.1987), however, this court reversed the district court's grant of summary judgment in favor of the government on the "intentional or willful" issue. In that case, a Texas bar applicant filed suit under subsection (b) of the Act, claiming that the Veterans Administration's ("VA") unsolicited release of information about him to the Texas Board of Law Examiners violated that provision. In its letter to the Texas Board, the VA informed the Board that the applicant had falsified a document in connection with a VA guaranteed home loan. The court rejected the government's argument that a plaintiff must show that an agency official acted with the actual intent to violate the Act. Instead, the court reiterated the "something greater than gross negligence" standard suggested by the House and Senate Compromise Amendments, *see Staff Analysis*, 120 Cong.Rec. at 40,405–06, and the "flagrant disregard of others' rights" standard articulated in *Albright II*, 732 F.2d at 189. Under either standard, the plaintiff had "certainly" raised a genuine issue of material fact about the VA's intent in making such an unsolicited disclosure. *Tijerina*, 821 F.2d at 799.

The agency's actions must be viewed in their context to determine whether the agency's staff acted in a willful or intentional manner. *Albright II*, 732 F.2d at 189. In Waters' case, the district court concluded that the Department met its initial summary judgment burden by showing that its decision to elicit information from the Pennsylvania Board before confronting Waters was premised upon reasonable doubts as to Waters' veracity, as well as on findings of possible impropriety in the use of subsequent leave periods. The government also claims that the letter did not show flagrant disregard of Waters' rights because sending it was "not inconsistent with the OMB Guidelines" which recognize the need to insure the accuracy of the information supplied by an individual. OMB Guidelines, 40 Fed.Reg. at 28,961. Moreover, the government suggests that its December 24, remedial letter to the Pennsylvania Board, designed to ensure that the original letter had conveyed no misimpression regarding Waters' good standing in the Department, supports its contention that any violation of the Privacy Act that occurred was not "intentional or willful." Brief for Appellee, at 21 n. 18.

Depending on the timing and the context, an agency's *post hoc* attempt to remedy the harm it may have caused may be a factor for the court to consider. *See Albright II*, 732 F.2d at 190 (agency's subsequent willingness to dispose of a videotape at the heart of a Privacy Act claim supported conclusion that agency did not act intentionally or willfully). But here, since the letter was written four months after the fact and only after appellant's counsel had suggested that a Privacy Act violation had occurred, it is not dispositive on the absence of a fact issue on the Department's intent at the time of the initial letter. Nor does the Department's reliance on one of the factors suggested in the OMB Guidelines indicate action consistent with the overall spirit of those Guidelines.

Even if these facts taken together were sufficient to satisfy the Department's initial burden of showing an absence of a genuine issue of material fact on intent, we believe that Waters has presented sufficient evidence to establish the existence of such an issue. First, the derogatory tone and content of the inquiry letter itself raises a significant question about the Department's regard for Waters' rights under the

Privacy Act. Second, as Waters argues, the letter "was not the product of one inexperienced investigator's sudden, misbegotten hunch." Reply Brief for Appellant at 18. Four supervisory level personnel were involved in the events that led up to sending the letter. Decl. of James O. Bennett, Supp.Ap. at 17. Yet, the record of the discussions between these individuals is devoid of mention of Privacy Act concerns. Finally, the Pennsylvania Board itself essentially placed the Department on notice of its forthcoming privacy invasion by informing Murphy that a request of the sort she was making had to be in writing, and would only be made if the letter persuasively demonstrated the need for the information. Decl. of Kathleen O. Murphy, Supp.Ap. at 30.

We believe these facts taken together show that the issue of intent was not so one-sided that the Department was entitled to judgment as a matter of law. *See Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33, 39 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988). The presence of these facts in the record "certainly" raise a genuine issue of material fact about the Department's intent such that a reasonable jury could return a verdict for the plaintiff. *See Tijerina v. Walters*, 821 F.2d at 799; *Liberty Lobby*, 477 U.S. at 251, 106 S.Ct. at 2511.

### III. REMEDY

■ Generally, when we reverse a grant of summary judgment, we do so because we find that a genuine issue of material fact precludes summary judgment. Here, Waters has asked this court to reverse the grant of summary judgment for the government, and to order summary judgment in his favor.

That the case was decided in the district court on cross-motions for summary judgment does not preclude a court from finding that genuine issues of material fact remain to be resolved. 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice § 56.13[1] at 56–175. *See Hartman v. C.W. Travel, Inc.*, 792 F.2d 1179, 1180 (D.C.Cir.1986) (where issue of fact as

to intent of the parties existed, summary judgment on cross-motion was inappropriate). This is true even though a mere denial of a summary judgment motion may not be immediately appealable under 28 U.S.C. § 1292(a)(1). Once an appellate court has jurisdiction in a case, it has broad discretion to order the appropriate relief. 28 U.S.C. § 2106. Where, as here, the case was presented on cross-motions for summary judgment, it may be appropriate to remand with directions to the district court to enter summary judgment on appellant's unsuccessful cross-motion for summary judgment. *See* 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.27[2] at 56–860 (2d ed.1988). This is particularly true in cases such as this one where the facts are straightforward, and the opposing party had notice and ample opportunity to respond to plaintiff's motion. *See, e.g., First Nat. Bank of Pa. v. Lincoln Nat. Life Ins.*, 824 F.2d 277 (3rd Cir.1987); *Morgan Guaranty Trust Co. of New York v. Martin*, 466 F.2d 593 (7th Cir.1972); *United States v. Toys of the World Club, Inc.*, 288 F.2d 89 (2d Cir.1961). *But see, Wise v. Braniff Airways, Inc.*, 622 F.2d 738, 743 (5th Cir.1980).

The government in this case had a full and fair opportunity to present evidence on the practicability issue. No genuine issue of material fact remains as to that issue. We have concluded as a matter of law that the government did not "to the greatest extent practicable" seek information from Waters. Because we find that it would be a waste of judicial resources to remand this issue, we direct the district court to enter partial summary judgment for Waters on that issue.

The question of whether the government's conduct rose to the level of "intentional or willful" under the statute, however, is not resolvable in the same manner. Although Waters has presented evidence sufficient to raise a triable issue, he has not established as a matter of law that he should prevail on summary judgment on that issue. Therefore, we vacate the grant of summary judgment in favor of the government on the intent issue and remand

to the district court for proceedings consistent with this opinion.