Margaret **DONG,** Plaintiff,

v.

**SMITHSONIAN INSTITUTION,**
Defendant.

**Civil Action No. 94–628 (GK).**

United States District Court,
District of Columbia.

Oct. 31, 1996.

Joseph V. Kaplan, John P. Mahoney, Passman & Kaplan, Washington, DC, for Plaintiff.

Nancy R. Page, Assistant U.S. Attorney, Washington, DC, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KESSLER, District Judge.

The Plaintiff, Margaret Dong, brings this action against her employer, the Smithsonian Institution, for damages caused by Defendant's alleged breach of its statutory obligations regarding the collection of employment information under the Privacy Act of 1974, 5 U.S.C. § 552a(e)(2) (1994).

### I. *Findings of Fact*

Plaintiff has been employed by the Hirshhorn Museum and Culture Garden since 1985. She began as a clerk-typist and was promoted to assistant registrar for outgoing loans. She is technically classified under the civil service system as a Museum Registration Specialist, and her civil service rating is currently GS–9.

Plaintiff works with individuals and organizations outside the museum to arrange for the loan of objects from the Hirshhorn to curators, directors, and registrars of other museums. Her job entails a wide range of responsibilities, and it appears that Ms. Dong has always performed them well. Over the years, her ratings on performance evaluations have been highly successful and, on occasion, outstanding.

One of Ms. Dong's duties, when appropriate, is to act as a courier for loan objects in transit. During the week of September 13 through 17, 1993, Ms. Dong served as a courier for the painting *Circus Horse* by Joan Miro, which is owned by the Hirshhorn. Ms. Dong accompanied the painting from

Barcelona, Spain, to the Museum of Modern Art in New York City, because she was concerned about the condition of the painting's frame. The shipping company handling the exhibit, sharing that concern, asked Ms. Dong to act as a courier.

Ms. Dong took annual leave for these days, even though she was entitled to take this trip on regular work time. Her airplane ticket, as well as a standard per diem fee, was provided by the Museum of Modern Art. Nothing in the record suggests that she did anything but serve as a courier on this trip. Her trip was not for vacation or pleasure.

Ms. Dong did not obtain the approval of the director of the Hirshhorn for this courier trip. Indeed, she told no one at the Hirshhorn that she would be taking the trip. There is no question that the failure to obtain the director's approval was a violation of museum procedures and regulations. Ms. Dong was ultimately suspended for five days for the violation of those museum procedures. That suspension is not an issue in this lawsuit.

Ms. Dong's failure to obtain the director's approval was clearly intentional on her part. Serving as a courier was a standard part of her job. She had never had a request to act as a courier turned down in the past, and she had no reason to believe that this request would be denied.

The reason she did not follow prescribed procedures was an unusual one. According to her testimony, the reason that she did not seek approval for the trip was related to problems she was having with a co-worker. Apparently, the co-worker caused problems when Ms. Dong was away on couriering duty, but not when she was simply out of the office on annual leave. Therefore, Ms. Dong chose to avoid problems with that co-worker by simply taking annual leave and not letting anyone know that she was acting as a courier for the Miro painting.

During the week of October 18, 1993, the administrator of the Hirshhorn, Ms. Beverly Pierce, heard a rumor from an employee that Ms. Dong had taken an unauthorized couriering trip. Ms. Pierce discussed the rumor with Douglas Robinson, who was the regis-

trar of the Hirshhorn and Ms. Dong's direct supervisor. Ms. Pierce is Mr. Robinson's supervisor, and she asked him to investigate the rumor. Mr. Robinson found no evidence of such a trip or its authorization when he investigated the Hirshhorn files.

Mr. Robinson then contacted Diane Farynyk, the registrar of the Museum of Modern Art to further investigate the rumor. He asked Ms. Farynyk to check the files of the museum for information regarding the transporting of the painting from Barcelona to New York. After checking the files, Ms. Farynyk contacted Ms. Pierce (in the absence of Mr. Robinson) at the Hirshhorn. Ms. Pierce also corresponded with Aileen Chuk, who was working at the Museum of Modern Art at the time the painting was transported there and arranged the courier trip with Ms. Dong.

Through her correspondence with Ms. Farynyk and Ms. Chuk, Ms. Pierce confirmed that Ms. Dong had couriered the Miro painting from Barcelona to the Museum of Modern Art in New York City.

Thereafter, Ms. Pierce conferred with employees at the Smithsonian in the Office of General Counsel and in the Office of Human Resources regarding the appropriate procedure to be followed and appropriate sanctions to be imposed for violation of museum procedures.

At no time prior to contacting any of these people did Ms. Pierce or Mr. Robinson contact Ms. Dong herself about her alleged misconduct or inquire into her version of the events which transpired. Both Ms. Pierce and Mr. Robinson testified that they proceeded without first contacting Ms. Dong because they hoped to establish that the original rumor was false. They believed that all unpleasantness for Ms. Dong would be avoided and the incident would end quietly if they simply determined the falseness of the rumor without confronting Ms. Dong.

It is apparent from both testimony and various exhibits in the record that there were many personnel problems in the Registrar's Office at the Hirshhorn. Ms. Dong had discussed and complained about some of them over the years.

Although they never questioned her competence, integrity, or trustworthiness, it is clear that neither Ms. Pierce nor Mr. Robinson wished to question Ms. Dong directly about a significant professional issue. Each felt that to do so would create further tension in an office which already seemed beset with personnel problems. Ms. Pierce and Mr. Robinson felt that the creation of such tension was unnecessary if they could determine that no factual basis for the rumor existed.

It is apparent from Mr. Robinson's testimony and demeanor that he is an administrator who avoids employee confrontation as well as direct answering of questions if at all possible. Ms. Pierce admitted that she never considered what the potential impact on Ms. Dong's reputation might be from going outside the Hirshhorn to question industry colleagues about the incident in question.

The Smithsonian has always taken the legal position that it is not covered by the Freedom of Information Act (FOIA), 5 U.S.C. 552, et seq., or the Privacy Act, 5 U.S.C. 552a(a) (1994). In Cotton v. Adams, 798 F.Supp. 22 (D.D.C.1992), Judge Charles Richey of this District Court held that the Smithsonian is an agency subject to FOIA and the related Privacy Act. The Smithsonian concedes that it has taken no action to inform its employees of the holding in that case because it believes the case was wrongly decided. All employees who testified on the subject at this trial stated that they never received any training or education about the substance or the requirements of the Privacy Act and that it was their understanding that the Smithsonian, including the Hirshhorn Museum, was not covered by the Act.

At an earlier stage in this litigation, this Court also ruled, in agreement with Cotton v. Adams, that the Smithsonian is an agency within the meaning of FOIA and the Privacy Act. Dong v. Smithsonian Institution, 878 F.Supp. 244 (D.D.C.1995).

II. Conclusions of Law

■  Plaintiff's claim against the Smithsonian is based on section 552a(e)(2) of the Privacy Act, which provides that agencies collect information to the greatest extent practicable from the subject individuals when the information may result in adverse determinations.

The D.C. Circuit held in Waters v. Thornburgh, 888 F.2d 870, 873 (D.C.Cir.1989) that "[i]n the context of an investigation that is seeking objective, unalterable information, reasonable questions about a subject's credibility cannot relieve an agency from its responsibility to collect that information first from the subject." The Waters court noted that the act "is fundamentally concerned with privacy. It supports the principle that an individual should, to the greatest extent possible, be in control of information about him [or her] which is given to the government ... a principle designed to insure fairness in information collection which should be instituted whenever possible." Id. at 875. The Waters opinion also points out that the agency does not have the option of choosing which source would provide the most accurate information. The point of the provision in question, 552a(e)(2), is that it "reflects congressional judgment that the best way to ensure accuracy in general is to require the agency to obtain information 'directly from the individual whenever practicable.'" Waters, 888 F.2d at 874 (quoting OMB Privacy Act Guidelines, 40 Fed.Reg. 28,949, 28,961 (1975)).

The OMB guidelines relied on in Waters were issued to implement and aid in the administration of the Privacy Act. They list several factors to be considered by agencies when they propose to collect information from a third-party source. Some of these considerations include: the nature of the program; the costs; the risk that the information collected from the third party, if inaccurate, could result in an adverse determination; the need to ensure the accuracy of information supplied by an individual; and, once the agency has determined that it was not practicable to obtain the information from the subject, the provisions for verifying any third-party information with the subject individual.

The Defendant here does not allege, nor does this record contain any indication, that the Plaintiff was not credible as a witness. On the contrary, her long record of exempla-

ry employment at the Hirshhorn attests to her credibility. There is no allegation or reason to believe that the Defendant feared that the Plaintiff would tamper with, falsify, or secrete evidence, or coerce or pressure any witnesses into giving false testimony, for the same reasons. Finally, there is no allegation that the Plaintiff engaged in previous impropriety which would give the Defendant reason to question her veracity, nor any evidence in the record that would support such an allegation. In fact, it is undisputed that when Ms. Pierce and Mr. Robinson ultimately confronted the Plaintiff with questions about the trip, she immediately admitted that she had taken it and that it had not been authorized.

The only reason given by Plaintiff's supervisors for failing to collect information directly from her about the unauthorized courier trip is the claim that they did not want to upset Ms. Dong with a rumor that might prove to be false, and that they were concerned about Plaintiff's alleged interpersonal problems with her colleagues.

Considering the entire record herein, the plain language and legislative history of the Privacy Act, the OMB guidelines, and the *Waters* case decided by our Circuit Court, this Court concludes that concern over Plaintiff's possible reaction to an unpleasant rumor does not warrant a violation of the Plaintiff's privacy interests. The record fully supports Plaintiff's claim that the agency failed to elicit information regarding her alleged unauthorized courier trip directly from her to the greatest extent practicable. Thus, Plaintiff has clearly satisfied this prong of the Privacy Act test.

The Privacy Act permits an individual to bring a civil action against an agency whenever an agency fails to comply with any provision of the Act in such a way as to have an adverse effect on the individual. 5 U.S.C. § 552a(g)(1)(D) (1994). To recover damages, Plaintiff must show that the violation by the agency was intentional or willful. *Id.* § 552a(g)(4).

█ Defendant has admitted that it informed top Smithsonian management of the District Court's holding in the early case of *Cotton v. Adams,* 798 F.Supp. at 22, that the Smithsonian was subject to FOIA. The record is also clear that top management took no action to inform its other employees of the holding in *Cotton v. Adams* simply because the agency believed that the case was wrongly decided. The Smithsonian made no effort to educate or instruct employees about the procedures and substance of either the Privacy Act or FOIA for the same reason.

These are clear indications that the agency intentionally chose to ignore the law merely because of its disagreement with the District Court's ruling. That ruling, significantly, was never appealed. This constitutes reckless disregard for the Privacy Act rights of the approximately two-thirds of the Smithsonian staff who are federal civil service employees. Such reckless disregard promotes an environment in which Privacy Act violations can readily and easily occur.

Defendant responds by arguing that it reasonably concluded from 1992 to 1995 that it was not covered by the Privacy Act. Defendant relies on our Circuit Court's decision in *Cotton v. Heyman,* 63 F.3d 1115, 1119 at note 2 (D.C.Cir.1995) for this proposition.

Although *Cotton v. Heyman,* on appeal, was the same basic case as that decided by the District Court in *Cotton v. Adams,* the *Heyman* case was in a very different procedural posture. *Heyman* involved an appeal of the attorneys' fees awarded in the underlying *Cotton* litigation. The Circuit Court stated that the agency's belief that it was not subject to FOIA at the time *Adams* was decided was a reasonable position, for purposes of challenging the award of attorneys' fees, especially in light of the fact that the issue had never been decided before. However, once *Cotton v. Adams* was decided, with its specific holding that the Smithsonian fits within the definition of "agency" in FOIA and thereby the Privacy Act, the Defendant could no longer reasonably conclude that it was exempt from the Privacy Act.

The investigation of Ms. Dong in this case took place long after issuance of the District Court's decision in *Cotton v. Adams.* The agency was on notice during its investigation of Ms. Dong that the District Court's ruling had been issued, that it was applicable, and

that it was the only decision in existence at that point on this particular issue. Once a decision is rendered by a District Court holding that an agency is subject to the Privacy Act, it is no longer reasonable for that agency to totally ignore the only existing case law (which it failed to appeal) simply because it thinks it was erroneously decided. For these reasons, the Defendant's violation of the Privacy Act was clearly willful and intentional.

To invoke the Privacy Act's civil remedy provision, Plaintiff must also establish that the agency's intentional or willful violation of the act had an adverse effect on her. Upon this showing, Plaintiff is entitled to actual damages sustained as a result of the violation. The statute provides, however, that in no case shall a person entitled to recovery under the statute based on its willful violation receive less than the sum of $1,000, and the costs of the action together with reasonable attorney fees as determined by the court. 5 U.S.C. § 552a(g)(4) (1994).

■ Actual damages under this provision of the statute encompass not only pecuniary losses, but also the ordinary elements of compensatory damages, such as mental depression and physical injury when these elements are supported by evidence in the record. *Johnson v. Department of Treasury*, 700 F.2d 971, 984–986 (5th Cir.1983).

In this case, Plaintiff claims damages for emotional trauma and distress and harm to her reputation. No claims were submitted for any out-of-pocket expenses.

■ In support of her claim of emotional harm, the Plaintiff testified that she has suffered from extensive and constant sleeplessness at night. Her condition has not been severe enough to require either medical or psychiatric care. Although the necessity of medical treatment is certainly not a requirement of establishing emotional distress, it is an indication of the existence and severity of the distress.

There is no evidence in the record that the emotional distress that Plaintiff suffered was so severe that it affected her in any other area of her life. At work she continued to excel and be promoted. No evidence suggests that her interpersonal relationships outside of work were affected by emotional distress. The Court credits the testimony that the Plaintiff was certainly upset over this matter and suffered sleeplessness. The distress was not severe enough, however, to warrant an award of damages.

■ The Plaintiff also claims damages for harm to her reputation. Certainly there was no harm to her reputation at work based on objective indicia. The record demonstrates that, since the incident in question, the Plaintiff was promoted to a civil service rating of GS–9, and at least on one occasion received an outstanding rating on her performance evaluation. Nothing in the record suggests that any negative work appraisals or demotions occurred.

The two individuals in New York, however, Ms. Chuk and Ms. Farynyk, certainly had some adverse reaction upon learning of Ms. Dong's unauthorized courier trip. Suspicions were created and red flags were raised in the minds of both of those individuals. Both women knew that the calls from Ms. Pierce and Mr. Robinson were most unusual and unorthodox. Ms. Chuk indicated clearly that in the future, if any kind of doubt arose about what Ms. Dong was requesting, she would contact Ms. Dong's supervisor.

While there is nothing tangible in the record to show loss of reputation or an actual impact on reputation, the Court recognizes from the testimony given in this case that this is a very small professional world. In this small world, many of the registrars know each other, and it is easy for one negative hint or intimation about Ms. Dong's integrity to have a ripple effect that could adversely affect her throughout that small professional community.

Therefore, the Court concludes that there was direct injury to Ms. Dong's reputation in terms of Ms. Chuk and Ms. Farynyk and indirect injury in terms of the small, rather close-knit professional milieu in which Ms. Dong worked. The injury was not severe, but when we are speaking of something as important, as amorphous, and as evanescent as reputation, even the slightest whisper can stain a lifetime of hard work.

Having considered all of the facts recited herein, as well as the existence of damages but lack of severity, the Court awards damages in this case in the sum of $2,500. The Court will entertain within 15 days a request for attorneys' fees. Accordingly, it is this 31st day of October, 1996, hereby

ORDERED that Defendant is adjudged liable for its unlawful collection of employment information about Plaintiff, under the Privacy Act, 5 U.S.C. § 552a(e)(2); and it is further

ORDERED that Defendant is liable to Plaintiff for $2,500 in compensatory damages.