United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 5, 1997 Decided October 17, 1997 

 No. 96-5303

 Margaret Dong, 

 Appellee

 v.

 Smithsonian Institution, Hirshhorn 

 Museum & Sculpture Garden, 

 Appellant

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 94cv00628)

 Nancy R. Page, Assistant U.S. Attorney, argued the cause 
for appellant. With her on the brief was Eric H. Holder, Jr., 
U.S. Attorney at the time the brief was filed, and R. Craig 
Lawrence, Assistant U.S. Attorney.

 Joseph Kaplan argued the cause for appellee. With him on 
the brief was John P. Mahoney.


 Before: Williams, Ginsburg and Henderson, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Williams, Circuit Judge: Margaret Dong brought this 
action against her employer, the Smithsonian Institution, for 
damages under the Privacy Act, 5 U.S.C. s 552a. The dis-
trict court found the Smithsonian liable and awarded plaintiff 
$2,500 in compensatory damages. Dong v. Smithsonian In-
stitution, 943 F. Supp. 69 (D.D.C. 1996). The Smithsonian 
appeals from the district court's determination that it is an 
"agency" subject to the Privacy Act. Dong v. Smithsonian 
Institution, 878 F. Supp. 244 (D.D.C. 1995). Alternatively, it 
argues that even if it is covered by the Act, its conduct 
toward plaintiff was not "intentional or willful" as required for 
imposition of damages under the Act. 5 U.S.C. s 552a(g)(4). 
We reverse.

 * * *

 Plaintiff began working at the Hirshhorn Museum and 
Sculpture Garden in 1985. She currently holds the position 
of Museum Registration Specialist, which means that her 
duties include serving as a courier for works of art the 
Hirshhorn lends to other museums. Museum procedures 
require employees to obtain permission from the director of 
the Hirshhorn before acting as a courier. In September 
1993, without seeking permission, plaintiff took annual leave 
and accompanied the painting Circus Horse by Joan Miro 
from Barcelona to the Museum of Modern Art ("MOMA") in 
New York City. At trial she testified that she deliberately 
failed to request approval for her trip, even though she had 
never had such a request denied in the past. Apparently her 
purpose was to avoid friction with a co-worker, who in her 
view made trouble when plaintiff was away on courier duty, 
but not when she simply took annual leave.

 Rumors of plaintiff's unauthorized journey soon reached 
the administrator of the Hirshhorn, Beverly Pierce, and 
plaintiff's immediate supervisor, Douglas Robinson. Through 
conversations with the registrar at MOMA and an employee 
of New York's Metropolitan Museum of Art who had worked 


at MOMA at the time of plaintiff's trip, Pierce and Robinson 
eventually substantiated the story. Both supervisors testified 
that they telephoned New York (rather than directly confront 
plaintiff) because they were aware of tensions in the Hirsh-
horn office where plaintiff worked, and wanted to put the 
rumors to rest without creating any additional workplace 
difficulties. When the rumors proved true, Pierce and Robin-
son approached plaintiff, who admitted taking the trip. She 
was suspended for five days.

 In March 1994 plaintiff instituted this action against the 
Smithsonian under the Privacy Act, which requires federal 
agencies, when gathering information that may lead to an 
adverse determination about an individual, to obtain that 
information directly from the individual "to the greatest 
extent practicable." 5 U.S.C. s 552a(e)(2); see Waters v. 
Thornburgh, 888 F.2d 870 (D.C. Cir. 1989). Damages are 
available under the Privacy Act for "intentional or willful" 
violations. 5 U.S.C. s 552a(g)(4). The Smithsonian defended 
on the theory that it is not an "agency" subject to the Act. 
In the alternative, it contended that its conduct could not be 
described as intentional or willful given its reasonable belief 
that the Act did not apply to it. Finally, the Smithsonian 
argues that even if the Privacy Act applied and even if its 
understanding to the contrary were not exculpatory, Pierce 
and Robinson's decision not to obtain information from the 
plaintiff in the first instance stemmed from a good faith belief 
that intra-office tensions rendered such a direct confrontation 
impracticable.

 The district court rejected all of the Smithsonian's argu-
ments. It found that the Smithsonian "has sufficient federal 
ties and control, as well as independent authority, to compel a 
finding of agency status under the Act." Dong, 878 F. Supp. 
at 248. The district court also held that the Smithsonian had 
intentionally or willfully violated the Act, saying that the 
institution was put on notice of its subjection to the Privacy 
Act by a 1992 district court opinion, Cotton v. Adams, 798 
F. Supp. 22, 24 (D.D.C. 1992), which found it to be an agency 
for the purposes of the Freedom of Information Act 


("FOIA"), a statute whose definition of "agency" also governs 
the Privacy Act.

 Because we hold that the district court erred in finding the 
Smithsonian to be an "agency" under the Privacy Act, we 
reverse without reaching its "intentional or willful" defenses.

 

 * * *

 The Privacy Act requires "[e]ach agency that maintains a 
system of records" to gather information about a person 
directly from that person, to the greatest extent practicable. 
5 U.S.C. s 552a(e)(2). The other requirements of the Act 
similarly apply to "agencies." See ss 552a(b), (c), (d), (f).

 Through s 552a(a)(1), the Act borrows the definition of 
"agency" found in FOIA, 5 U.S.C. s 552(f).1 That definition 
in turn reads as follows:

 For purposes of this section, the term "agency" as de-
 fined in section 551(1) of this title includes any executive 
 department, military department, Government corpora-
 tion, Government controlled corporation, or other estab-
 lishment in the executive branch of the Government 
 (including the Executive Office of the President), or any 
 independent regulatory agency.

5 U.S.C. s 552(f). Section 552a(a)(1) cross-references 5 
U.S.C. s 551(1), the definition of "agency" in the Administra-
tive Procedure Act ("APA"), but does not explicitly incorpo-
rate it. Still, as the parties recognize, the Privacy Act 
encompasses not only all entities covered by s 552(f) but also 
all those described by s 551(1), which embraces any "authori-
ty of the Government of the United States, whether or not it 
is within or subject to review by another agency." Indeed, 
the additional language of s 552(f) was added to FOIA in 
1974 "to encompass entities that might have eluded the APA's 
definition in s 551(1)." Energy Research Foundation v. De-
fense Nuclear Facilities Safety Board, 917 F.2d 581, 583 
(D.C. Cir. 1990).

__________
 1 Actually, s 552a(a)(1) refers to "agency as defined in section 
552(e) of this title," but s 552(e) has since been redesignated 
s 552(f).


 Hence, to be an agency under the Privacy Act, an entity 
must fit into one of the categories set forth either in s 552(f) 
or s 551(1). Because we cannot see how the Smithsonian fits 
into any of them, we hold that it is not an agency for Privacy 
Act purposes.

 Of the categories listed in s 552(f), the only ones that 
might be thought to cover the Smithsonian are "establish-
ment in the executive branch" and "Government controlled 
corporation." It is plain that the Smithsonian is not an 
establishment in the executive branch. To begin with, nine of 
the seventeen members of its governing Board of Regents are 
appointed by joint resolution of Congress, 20 U.S.C. s 43, and 
six of the remaining eight are members of Congress, 20 
U.S.C. s 42. (The other two are the Vice President and the 
Chief Justice of the United States, id.) Moreover, there is no 
evidence that the Secretary of the Smithsonian answers to 
the President, or that the institution administers federal 
statutes, prosecutes offenses, promulgates rules and regula-
tions (other than with respect to its own buildings and 
grounds), or engages in any other typically executive activity. 
Indeed, if the Smithsonian were to wield executive powers, 
the method by which its Regents are appointed would appear 
to violate the Constitution's separation of powers principles. 
See U.S. Const., art. II, s 2, cl. 2; Buckley v. Valeo, 424 U.S. 
1, 138-39 (1976) (officeholders appointed by Congress may act 
only "in an area sufficiently removed from the administration 
and enforcement of the public law to permit their being 
performed by persons not 'Officers of the United States' "); 
Metropolitan Washington Airports Authority v. Citizens for 
the Abatement of Aircraft Noise, 501 U.S. 252, 275-76 (1991).

 Nor is the Smithsonian a "Government controlled corpora-
tion" within the meaning of the Privacy Act. There is much 
force to the Smithsonian's argument that the plain terms of 
the phrase itself simply do not encompass it. In particular, 
the Smithsonian contends that it is not "government-
controlled" in the day-to-day sense required by our cases, see 
Rocap v. Indiek, 539 F.2d 174, 177 (D.C. Cir. 1976), and that 
it is not a "corporation," but rather a testamentary trust res 


denominated an "establishment" by Congress in 1846, 20 
U.S.C. s 41. We find it unnecessary to address these argu-
ments, however. Section 552(f) first identifies four specific 
categories--"any executive department, military department, 
Government corporation, Government controlled corpora-
tion"--and then uses a catch-all phrase to encompass similar 
entities not precisely fitting any of the four specific molds: 
"or other establishment in the executive branch" (emphasis 
added). Thus Congress evidently viewed the four specified 
classes as examples of "establishments in the executive 
branch," so that an entity clearly outside the executive branch 
would not qualify even if it could otherwise be shoehorned 
into the concept of a "Government controlled corporation." 2 
This is the most logical reading of the statute; for those who 
collect canons of construction it might be termed an applica-
tion of "reverse ejusdem generis (where the general term 
reflects back on the more specific rather than the other way 
around), [so] that the phrase 'A, B, or any other C' indicates 
that A is a subset of C." United States v. Williams-Davis, 
90 F.3d 490, 508-09 (D.C. Cir. 1996).3 In short, then, because 

__________
 2 A 1993 report of the House Committee on Government Opera-
tions takes the same view of the first four entities listed in s 552(f). 
In a "Citizen's Guide" to FOIA, under the heading "The Scope of 
the Freedom of Information Act," it says:

 The Federal Freedom of Information Act applies to documents 
 held by agencies in the executive branch of the Federal Gov-
 ernment. The executive branch includes cabinet departments, 
 military departments, government corporations, government 
 controlled corporations, independent regulatory agencies, and 
 other establishments in the executive branch.

"A Citizen's Guide on Using the Freedom of Information Act and 
the Privacy Act of 1974 to Request Government Records," H.R. 
Rep. No. 103-104, at 5 (1993).

 3 Congress's decision to place the so-called independent regulato-
ry agencies after the catch-all phrase confirms this interpretation, in 
view of the uncertain constitutional status of such agencies vis--vis 
the executive branch. Compare Wiener v. United States, 357 U.S. 
349, 353 (1958) (President may freely remove officials who are "part 
of the Executive establishment," as opposed to "those whose tasks 


the Smithsonian is not an establishment in the executive 
branch, it cannot fall into any of the conceivably applicable 
s 552(f) categories.

 Plaintiff proposes that we read the word "includes" in 
s 552(f) as an invitation to extend agency status to entities 
that do not belong among the types enumerated but have 
something in common with them. In support of this idea, she 
points to legislative history indicating that s 552(f) was in-
tended to broaden FOIA's scope so that it would embrace 
entities "which perform governmental functions and control 
information of interest to the public." H.R. Rep. No. 876, 93d 
Cong., 2d Sess. 8 (1974). But Congress did not back this 
observation with any statutory text remotely matching its 
scope, such as "governmental entity," and accordingly we 
stick to the text as enacted.

 We recognize, of course, that the word "includes" normally 
does not introduce an exhaustive list but merely sets out 
examples of some "general principle." Federal Land Bank of 
St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 100 (1941). 
But behind s 552(f)'s enumeration there appears to be no 
general principle in sight other than the one set out in 
s 551(1); indeed, plaintiff points to no alternative general 
principle. Moreover, as we have just said, s 552(f)'s struc-
ture indicates that Congress did perceive a unifying theme in 
the four specific kinds of entity mentioned before the catch-all 
clause--a theme (belonging to the executive branch) not 
manifest in the Smithsonian. Accordingly, we now turn to 
s 551(1).

 Plaintiff asserts that the Smithsonian fits s 551(1)'s core 
phrase, "authority of the Government of the United States." 
In support of this proposition she marshals an impressive 
array of links between the Smithsonian and the federal 
government. To list the main ones: the Smithsonian oper-
ates under a federal charter granted by Congress in 1846; 

__________
require absolute freedom from Executive interference") with Morri-
son v. Olson, 487 U.S. 654, 687-92 (1988) (Congress may place some 
limits on President's discretion to remove officials exercising execu-
tive functions).


most of its employees--some 70% according to plaintiff, Brief 
for Appellee at 16 n.3--are considered federal civil service 
employees; its Regents, as mentioned, are federal officials or 
are selected by federal officials; it receives extensive federal 
funding and must submit a detailed annual statement of its 
expenditures to Congress, 20 U.S.C. s 49; it is subject to the 
audit and reporting requirements of the Government Ac-
counting Office; "[a]ll moneys recovered by or accruing to 
[the Smithsonian are] paid into the Treasury of the United 
States, to the credit of the Smithsonian bequest, and sepa-
rately accounted for," 20 U.S.C. s 53; it enjoys federal 
immunity from taxes and libel actions; it receives representa-
tion (as in this case) from the Department of Justice; and it 
publishes rules and notices in the Code of Federal Regula-
tions and the Federal Register. See Dong, 878 F. Supp. at 
248-49; Cotton v. Adams, 798 F. Supp. at 24.

 We have already held that factors like these justify classify-
ing the Smithsonian as an "independent establishment of the 
United States" for purposes of the Federal Tort Claims Act. 
See Expeditions Unlimited Aquatic Enterprises, Inc. v. 
Smithsonian Institution, 566 F.2d 289, 296 (D.C. Cir. 1977) 
(en banc). But the statute in question here uses narrower 
language; an entity may be deeply entwined with the federal 
government without being an "authority of the Government of 
the United States." Ultimately, then, as we said in rejecting 
a similar claim, plaintiff's litany of links between the Smithso-
nian and the federal government is "like Homer's catalogue of 
ships--exhaustive but quite beside the point." Meyer v. 
Bush, 981 F.2d 1288, 1294 (D.C. Cir. 1993).

 The term "authority" is not self-defining. At the very 
least, however, it seems logical that for an entity to be an 
authority of the government it must exercise some govern-
mental authority. Scholars of the APA appear to agree. As 
one commentator put it, an "agency" for APA purposes is

 a part of government which is generally independent in 
 the exercise of [its] functions and which by law has 
 authority to take final and binding action affecting the 
 rights and obligations of individuals, particularly by the 


 characteristic procedures of rule-making and adjudica-
 tion.

James O. Freedman, "Administrative Procedure and the Con-
trol of Foreign Direct Investment," 119 U. Pa. L. Rev. 1, 9 
(1970) (internal quotations omitted) (cited in Irwin Memorial 
Blood Bank v. American National Red Cross, 640 F.2d 1051, 
1053 (9th Cir. 1981)). See also 1 Kenneth Culp Davis & 
Richard J. Pierce, Jr., Administrative Law Treatise s 1.2, at 
4 (3d ed. 1994) (focusing on whether "the entity has, or lacks, 
authority to take binding action"); Washington Research 
Project, Inc. v. Dep't of Health, Education and Welfare, 504 
F.2d 238, 248 & n.15 (D.C. Cir. 1974) (citing legislative history 
of APA in support of a requirement of "final and binding 
action"); J.H. Miles & Co., Inc. v. Brown, 910 F. Supp. 1138, 
1159 (E.D. Va. 1995) (holding that quasi-government fisheries 
council "is not an 'authority' of the U.S. Government because 
it has no 'authority' to do anything").

 Our cases have followed the same approach, requiring that 
an entity exercise substantial independent authority before it 
can be considered an agency for s 551(1) purposes. It is 
quite true that, apart from its roots in the language of 
s 551(1) and its legislative history, our "substantial indepen-
dent authority" test both originated in a case involving an 
entity in the Executive Office of the President, Soucie v. 
David, 448 F.2d 1067 (D.C. Cir. 1971) (Office of Science and 
Technology), and has most often been applied in the case of 
such entities, see Armstrong v. Executive Office of the Presi-
dent, 90 F.3d 553 (D.C. Cir. 1996) (National Security Council); 
Meyer, 981 F.2d at 1291-98 (Task Force on Regulatory 
Reform); Rushforth v. Council of Economic Advisers, 762 
F.2d 1038, 1040-43 (D.C. Cir. 1985) (Council of Economic 
Advisers); Pacific Legal Foundation v. Council on Environ-
mental Quality, 636 F.2d 1259, 1263 (D.C. Cir. 1980) (Council 
on Environmental Quality); cf. Sweetland v. Walters, 60 F.3d 
852 (D.C. Cir. 1995) (Executive Residence of the President, 
deemed "analogous" to a unit of the Executive Office of the 
President). In such cases, naturally, much of the focus was 
on the independence aspect of the formula, since obviously 
the President exercises authority, and those who have his ear 


must at a minimum possess some degree of derivative author-
ity. But the requirement of authority derives both from the 
statutory language itself and from legislative history charac-
terizing the requisite type of authority ("final and binding," 
see H.R. Rep. No. 1980, 79th Cong., 2d Sess., at 19 (1946), 
cited in Washington Research Project, 504 F.2d at 248-49 
n.15), and we have applied the requirement in at least two 
cases not involving presidential power at all. In Energy 
Research Foundation we applied it to the Defense Nuclear 
Facilities Safety Board, 917 F.2d at 584-85 (finding it covered 
because of its investigative and evaluative powers), and in 
Washington Research Project we held that "initial research 
groups," scholars appointed by the National Institute of 
Mental Health primarily from outside NIMH to conduct peer 
review of grant applications, were not agencies under the 
FOIA definition precisely because of their lack of authority 
even to make government grants, 504 F.2d at 248.

 Washington Research Project might be read to imply that 
the "initial research groups," had they in fact possessed the 
power to decide how federal grant money was spent, would 
have been considered agencies for FOIA purposes. But we 
have already warned against such a reading of that case. 
"We held [in Washington Research Project] that because the 
organization in question had no authority to make decisions it 
was not a government agency, but the converse of that 
proposition may not always be true; that an organization 
makes decisions does not always mean that it is a government 
agency." Public Citizen Health Research Group v. Dep't of 
Health, Education and Welfare, 668 F.2d 537, 543 (D.C. Cir. 
1981). In addition, in Washington Research Project we noted 
that the body that was empowered to determine the allocation 
of the grants in question, the National Advisory Mental 
Health Council ("NAMHC"), derived this power directly from 
a statute which "empower[ed] the Secretary [of Health, Edu-
cation & Welfare] to make grant awards if (and only if) the 
NAMHC so recommends." Id. at 248. Plaintiff has identi-
fied no comparable delegation of authority to the Smithsonian 
to control the allocation of federal research dollars, and we 
know of none. To the extent that the Smithsonian devotes 


part of its own budget to funding grants and fellowships, it 
appears to be no different from any private research universi-
ty which receives federal funds and enjoys some control over 
their use.

 The Smithsonian is a cultural and research institution, 
established in 1846 pursuant to a trust bequest of James 
Smithson, and dedicated to "the increase and diffusion of 
knowledge among men." 20 U.S.C. s 41. It does not make 
binding rules of general application or determine rights and 
duties through adjudication. It issues no orders and per-
forms no regulatory functions. Plaintiff's efforts to demon-
strate that the Smithsonian exercises authority focus mainly 
on Congress's delegation to the institution of limited police 
powers, including arrest powers, on its own grounds. See 40 
U.S.C. ss 193n, 193v, 193t. She also notes that Congress has 
authorized the Smithsonian to promulgate regulations in sup-
port of its power to maintain safety and order on its premises. 
40 U.S.C. s 193r; see 36 CFR ss 504-20. Yet these limited 
powers, which enable the Smithsonian to protect its own 
collections and facilities, fall far short of converting the 
Smithsonian into "an authority of the Government of the 
United States." As we said recently, "the Smithsonian's 
ability to hire its own police force carries little probative 
weight in that many private museums employ their own 
security personnel." Cotton v. Heyman, 63 F.3d 1115, 1122 
(D.C. Cir. 1995).

 Our cases, as noted, speak of "substantial independent 
authority." They do not support the proposition that the 
exercise of any independent authority, however confined, 
converts an entity into an "authority of the Government of 
the United States." For example, we affirmed a district 
court decision that the National Academy of Sciences 
("NAS") was not an "agency" under s 551(1) despite the fact 
that it possessed the apparent authority--greater than any 
possessed by the Smithsonian--to veto the Environmental 
Protection Agency's suspension of auto emission standards. 
Lombardo v. Handler, 397 F. Supp. 792, 794 (D.D.C. 1975), 
aff'd, 546 F.2d 1043 (D.C. Cir. 1976). Like the NAS, the 
Smithsonian simply is not the kind of "center of gravity in the 


exercise of administrative power" to which s 551(1) refers. 
Lombardo, 397 F. Supp. at 796 (citing Freedman, 119 U. Pa. 
L. Rev. at 9).

 In the most literal sense, of course, the Smithsonian's 
broad, Congressionally-granted latitude over spending its fed-
erally allocated funds and over its own personnel and collec-
tions indicates that it possesses "authority in law to make 
decisions." Cotton v. Heyman, 63 F.3d at 1122 (citing Wash-
ington Research Project, 504 F.2d at 248). But every private 
organization possesses the power to order its own affairs and 
carry out transactions with others within the limits set by 
law. To the extent the Smithsonian exercises anything ap-
proaching public authority, that authority appears to be en-
tirely ancillary to its cultural and educational mission.4 Au-
thority must be governmental in nature to count for s 551(1) 
purposes.

 Finally, plaintiff points out that the Smithsonian is treated 
as an agency under other federal statutes. Indeed, in ac-
knowledging plaintiff's extensive enumeration of governmen-
tal ties we cited the finding of Expeditions Unlimited, 556 
F.2d at 296, that the Federal Tort Claims Act embraced the 
Smithsonian, but pointed out that the FTCA defined "Federal 
agency" broadly to include "independent establishments of 
the United States." 28 U.S.C. s 2671. Unsurprisingly, the 
Smithsonian is subject to other statutes whose language also 
differs from that of the Privacy Act. Thus, Smithsonian 
employees are covered by the Federal Employment Compen-
sation Act, which applies to employees of "instrumentalit[ies] 
wholly owned by the United States," 5 U.S.C. s 8101(1)(A), 
which the Smithsonian concedes it is, at least insofar as the 
United States, as trustee, holds legal title to the original 
Smithson trust property and later accretions. Similarly, it is 
subject to the Inspector General Act ("IGA") not by virtue of 

__________
 4 In addition to the "on-campus" police powers mentioned above, 
Congress has delegated to the Smithsonian control over certain 
cultural and research facilities such as the National Zoo, see 20 
U.S.C. s 81, and the Canal Zone Biological Area, a 4000-acre 
tropical forest on Barro Colorado Island, see 20 U.S.C. s 79b.


any agency status, but because Congress has declared it a 
"designated Federal entity" for IGA purposes, 5 U.S.C. App. 
3, s 8G(a)(2). The Smithsonian's status under these other 
statutes is therefore inapposite.

 In sum, the Smithsonian lacks both the "authority" neces-
sary for it to qualify as an "authority of the government of 
the United States" under s 551(1) and the executive depart-
ment status necessary under s 552(f).

 The judgment of the district court is therefore

 Reversed.