**Dennis OLIVARES, Plaintiff,**

v.

**NATIONAL AERONAUTICS and Space Administration, et al., Defendant.**

**Civ. No. PJM–92–3439.**

United States District Court, D. Maryland.

April 27, 1995.

James M. Eisenmann, Washington, DC, for plaintiff.

Richard D. Bennett, Kathleen McDermott, Baltimore, MD, Barbara J. Kraft, Washington, DC, for defendant.

## *OPINION*

MESSITTE, District Judge.

Dennis Olivares and his employer, National Aeronautics and Space Administration (NASA), have been at odds for a considerable time. Since at least 1989, Olivares has clashed with NASA over the conditions of his employment, causing him to file among other things Equal Opportunity Employment complaints, grievances through his union (the Goddard Engineers, Scientists and Technicians Association) and various requests under the Freedom of Information Act, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a. On December 8, 1992, Olivares filed the present suit against NASA and a number of individual NASA employees, seeking declaratory relief, a writ of mandamus, and damages for alleged violations of the Privacy Act and miscellaneous constitutional rights and for related torts including a claim under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* On March 12, 1993, Olivares sought leave to file an Amended Complaint, attaching the proposed pleading to his motion. By the Amended Complaint he sought, besides the relief sought in the original Complaint, to join an additional individual defendant, to recover damages for records collected and maintained at NASA pertaining to alleged threats made by him against co-employees, and to add counts for defamation and intentional interference with contract under Maryland law.

Although the Amended Complaint is the last operative complaint filed by Olivares, the Court's predecessor in these proceedings (Nickerson, J.), pursuant to Defendants' motion, has pared down the number of parties and causes of action quite dramatically. All individual defendants have either been dismissed or permission to add them denied;

only NASA remains as a defendant. The sole claims that survive are those under (1) the Privacy Act, 5 U.S.C. § 552a(e)(2) pertaining to Olivares' educational credentials and (2) the Privacy Act, 5 U.S.C. § 552a(e)(2), (e)(5), and (g)(1) pertaining to incidents in which it is alleged that Olivares threatened co-employees and on one occasion possessed a firearm at work. As to those causes of action, NASA has renewed its Motion to Dismiss or, in the Alternative, for Summary Judgment. Olivares opposes these Motions and has filed his own Cross–Motion for Summary Judgment.

The Court has determined to grant NASA's Motion for Summary Judgment and to deny the Cross–Motion of Olivares.

## II.

Summary judgment is appropriate if "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When a moving party supports its motion under Rule 56 with affidavits and other appropriate materials pursuant to the rule, the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... the response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. Civ.P. 56(e). Summary judgment is appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there (being) no genuine issue at trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III.

Although the Amended Complaint is difficult to follow, the undisputed facts pertaining to Olivares' educational credentials appear to be these:

Beginning with his initial employment in 1986 at NASA's Goddard Space Flight Center in Greenbelt and as part of his application for several different positions at the Center thereafter, Olivares filed a number of SF–171's, the standard Government application for employment. On each of these SF–171's Olivares stated, inter alia, that he had obtained a Bachelor of Science Degree in Physics from Loyola University (in New Orleans) and a Master's Degree in Political Science from George Washington University (in the District of Columbia). Each SF–171 contained language by which Olivares consented to the investigation of information in the statement, specifically authorizing educational institutions to release information to investigators, personnel staffing specialists, and other authorized employees of the Federal Government.[1] Each statement was subscribed and sworn by Olivares.

In connection with his initial employment, a position requiring a security clearance, NASA requested that its Office of Personnel Management (OPM) conduct a limited background investigation. The OPM investigator contacted the educational institutions Olivares had listed on his application and conducted a personal interview with him. Based on his contact with the schools and the interview, the investigator reported that Olivares did not in fact possess two educational degrees claimed on his SF–171, viz., the 1975 Bachelor's Degree in Physics from Loyola and the 1985 Master's Degree from George Washington University, noting these as "potentially actionable issues." Jerry Simpson, Head of the Personnel Management Branch at Goddard, thereupon asked a Personnel Staffing Specialist, Shirley Smith, to verify Olivares' educational credentials a second time. As indicated by a memorandum dated July 27, 1987, Smith confirmed with Loyola that while Olivares had participated in a dual degree program in physics and political science, since Loyola did not award two Bachelor Degrees, Olivares had chosen the degree

---

1. The statement, in pertinent part, read:

    "I have completed this Statement with the knowledge and understanding that any or all items contained herein may be subject to investigation prescribed by law or Presidential directive and I consent to the release of information con-

    cerning my capacity and fitness by employers, educational institutions, law enforcement institutions, and other individuals and agencies, to duly accredited investigators, Personnel Staffing Specialists, and other authorized employees of the Federal Government for that purpose."

in political science. Smith also verified that Olivares had received both Masters and Law Degrees from George Washington. On the basis of Smith's report, Simpson found no cause to question further Olivares' suitability for employment and Olivares remained at his post at NASA. The Smith to Simpson memorandum dated July 27, 1987 and Simpson's memorandum to the Security office, dated November 16, 1987, were maintained in Olivares' security file, but not in his file in the Office of Labor and Employee Relations.

The question of Olivares' educational credentials surfaced again in approximately March 1989 when, according to John Ferguson, Head of Goddard's Labor and Employee Relations Office, he was contacted by P. Christopher Schwartz, Olivares' immediate supervisor, who expressed "serious doubts" about whether Olivares was qualified for his position[2]. Ferguson deemed it appropriate to verify Olivares' academic credentials yet again without, however, attempting to contact Olivares about the matter first. Instead, Betty Brocki, a Personnel Management Specialist, called Loyola directly and was advised that Olivares had received a B.A. degree in "philosophy" and that, while he had completed credits for a double major, he had received no other degree.[3] Brocki called George Washington and was told that, although Olivares had received a J.D. degree from that institution and had earned 15 credit hours toward a Masters Degree as of May 1985, no award of a Master Degree in political science could be verified.[4] Presumably Brocki's report was placed in Olivares' general personnel file, although no immediate action appears to have been taken against him.

Contemporaneous events, however, lend context to Ferguson's inquiry. As of March 31, 1989, Olivares had filed the first of what were to be four employment discrimination complaints against NASA, this one alleging discrimination based on his race (Hispanic) and national origin (Mexican), as well as alleged retaliation for his pursuit of the grievance process. It was in connection with his review of the multi-volume report based on his EEO complaint that Olivares claims he discovered the Brocki memorandum, the basis of his present claim. Reading affidavits from co-employees suggesting that he might have lied about his educational background, Olivares launched a wholesale request for his employment records from NASA, combined with a demand that alleged inaccuracies in those records be amended. Although many of the documents he sought pertained to matters well beyond his educational credentials and were, for various reasons, eventually denied him, in the Fall of 1991 Olivares received a copy of the 1989 Brocki memorandum setting forth her efforts to verify Olivares' degrees. Upon that, Olivares has fashioned his claim that NASA violated 5 U.S.C. 552a(e)(2) of the Privacy Act.

## IV.

The Privacy Act of 1974, 5 U.S.C. § 552a(e)(2), provides that:

[e]ach agency that maintains a system of records shall ... collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits and privileges under Federal programs.

Citing the Congressional staff analysis relative to this provision, the U.S. Court of Appeals for the District of Columbia in *Waters v. Thornburgh*, 888 F.2d 870 (D.C.Cir.1989), observed that:

[t]he section was designed to "discourage the collection of personal information from

---

2. According to the decision of the Administrative Law Judge in Olivares' consolidated EEO proceedings, Olivares was hired by NASA/Goddard Space Flight Center in November 1986 as an Electronics Engineer; late 1987 or early 1988, he transferred to a unit working with Small Business Innovative Research programs; in 1988 he worked on assignments with the Space Station and with Global Geospace Science; and in 1989 he worked in the Tracking Data Relay Satellite System (TDRS) and advanced TDRS.

3. In contrast, Shirley Smith's memorandum of July 27, 1987, reported that Olivares' degree from Loyola was in "Political Science", not "Philosophy".

4. On his SF–171's, Olivares claimed completion of 33, as opposed to 15, credit hours toward his Masters Degree as of May, 1985.

third party sources and therefore to encourage the accuracy of Federal data gathering. * * * The Act is fundamentally concerned with privacy. It supports "the principle that an individual should to the greatest extent possible be in control of information about him which is given to the government ... a principle designed to insure fairness in information collection which should be instituted wherever possible."

888 F.2d at 874–75.

■ *Waters* highlights the three elements necessary to establish a violation of the Act. A plaintiff must show that (1) the agency failed to elicit information directly from him "to the greatest extent practicable", 5 U.S.C. § 552a(e)(2); (2) violation of the Act was "intentional or wilful", 5 U.S.C. § 552a(g)(4); and (3) the action had an "adverse effect" on him, 5 U.S.C. § 552a(g)(1)(D), *Waters*, 888 F.2d at 872. The Court will refer to this claim of Olivares as his "*Waters* claim".

Olivares contends that, when NASA attempted to re-verify his educational credentials in March 1989, it failed to elicit information from him "to the greatest extent practicable" and did so "intentionally and wilfully", all of which had an "adverse effect" upon him. He claims, in consequence, no less than $410,000.00 in damages.[5] NASA insists that in fact it did elicit information directly from Olivares "to the greatest extent practicable", but says even if it did not, Olivares has failed to show that it acted intentionally or wilfully or with any adverse effect upon him. The Court considers the three factors.

### A. "To the Greatest Extent Practicable"

■ The phrase "to the greatest extent practicable" has a "blurred edge, [an] uncertain line".[6] It depends on the facts and circumstances of the particular case. It is one thing for an agency to pursue a rumor about how an employee spends his leave time without first talking to the employee, as in *Waters*. It is a very different thing when the

agency's inquiry pertains to the individual's educational credentials and the individual has executed an express authorization for the agency to inquire about those credentials. In the case at hand, Olivares wrote out his educational credentials, then specifically certified on his SF–171 that:

> I have completed this Statement with the knowledge and understanding that any or all items contained herein may be subject to investigation prescribed by law or Presidential directive and I consent to the release of information concerning my capacity and fitness by employers, educational institutions, law enforcement institutions, and other individuals and agencies, to duly accredited investigators, Personnel Staffing Specialists, and other authorized employees of the Federal Government for that purpose.

■ From all appearances, the relevant information regarding his credentials had already been elicited directly from Olivares to the greatest extent practicable. Olivares, in fact, does not question the legitimacy of the initial limited background investigation conducted by OPM in 1987, including the contacts made by the OPM investigator and Shirley Smith at that time. What he argues is that NASA's attempt to re-verify his credentials in March 1989 was a separate investigation as to which he was entitled to be contacted in advance; in effect that his consent was limited in time to the first investigation and invalid thereafter. The Court disagrees.

In the first place, there is nothing on the face of the initial SF–171 that limits the duration of the consent. The paragraph that precedes the paragraph establishing the consent provides that "[a] false answer to any question in this Statement may be grounds for not employing you, *or for dismissing you after you begin work* ..." (Emphasis supplied). Such language unmistakably comprehends the possibility of follow-up. Moreover,

---

**5.** If a plaintiff proves the three elements constituting a violation of the Privacy Act, he is entitled to the greater of $1,000.00 or actual damages sustained. 5 U.S.C. § 552a(g)(4).

**6.** "Those of us whose lives have been spent on the bench or at the bar ... know the value of the veiled phrase, the blurred edge, the uncertain line." *Cardozo; Law and Literature (Harcourt, Brace & Company, 1931) p. 137.*

as a matter of policy, there is no reason why the consent should be limited in time. Delays may occur in verifying information; upon review, discrepancies may be noted with regard to matters previously verified. An applicant earns no vested right in inaccurate information, whether supplied by him intentionally or unintentionally. Indeed, if an individual becomes aware of misinformation stated on his application, it is presumably incumbent upon him to modify his application in appropriate fashion.

Finally, even if Olivares were correct that a consent given in an initial SF–171 is not valid "in perpetuity", he is hardly in a position to make that argument. Each of the multiple SF–171's filed by him thereafter contained its own consent to the agency to elicit information in connection with his educational credentials. Each constituted a new and separate authorization to verify.

The reality is that the official record of Olivares' degrees was inconsistent and confused from the beginning. Olivares swore in 1986 and on multiple occasions thereafter that he held a Bachelor of Science Degree in Physics and a Master's Degree in Political Science. The report of the first investigation in 1987 showed he did *not* hold those two degrees, whereas the report of Shirley Smith that same year showed that Olivares' Bachelor degree was in Political Science, not Philosophy as Olivares claimed, and that he did hold a Masters degree in Political Science from George Washington. Venturing upon these conflicting reports at a later time, for whatever reason, and given Olivares' repeated oaths on all subsequent SF–171's consistent with his original version, NASA could fairly undertake to clarify the matter directly with the educational institutions again and could do so without contacting Olivares. On these facts, as a matter of law, NASA had already contacted Olivares directly "to the greatest extent practicable".

## B.  *"Intentional or Wilful Conduct"*

█ Assuming the Court were to find that NASA's conduct violated the Privacy Act, Olivares could still not recover damages unless he could show that the "agency acted in a manner which was intentional or wilful"

*See* 5 U.S.C. § 552a(g)(4). *Waters v. Thornburgh,* 888 F.2d at 875. "Intentional or willful" has been variously defined as "somewhat greater than gross negligence", *Id.,* or an act committed "without grounds for believing it to be lawful, or by flagrantly disregarding others rights under the Act." *Albright v. United States,* 732 F.2d 181, 189 (D.C.Cir. 1984). Mere evidence that the Government has acted negligently will not suffice, nor will it do to show that the Government acted in a disjointed or confused manner or inadvertently to contravene the Act, *Waters v. Thornburgh,* 888 F.2d at 875–876.

█ In the case at hand, it cannot even be maintained that NASA acted negligently. Quite to the contrary, NASA's actions were prudent as a matter of law. Thus, for the sake of argument the Court will assume that Olivares' initial consent was limited to his initial limited background investigation and that his several subsequent SF–171s have no bearing. Nevertheless, given the discrepancies in the record that existed with regard to his educational background from the outset, NASA was entitled to verify and correct Olivares' record any time those discrepancies might come to light. In no sense did NASA come close to acting "intentionally or wilfully" within the meaning of the Privacy Act.

## C.  *Adverse Effect*

Accepting for present purposes that emotional trauma alone suffices to qualify as "adverse effect" under (g)(1)(D) of § 552a, *see Quinn v. Stone,* 978 F.2d 126 (3rd Cir. 1992), *Albright v. U.S.,* 732 F.2d 181 (D.C.Cir.1984), Olivares has undoubtedly alleged and the Court is prepared to believe that he has suffered stress and emotional anguish in his clash with NASA. However that may be, Olivares' feelings are compensable if and only if he can establish a violation of the Privacy Act that was committed intentionally and wilfully. Since, as stated, he has failed to establish the first two elements of his *Waters* claim, he is without remedy for his distress in this Court. NASA is entitled

to Summary Judgment on the claim pertinent to Olivares educational credentials.[7]

## V.

■ In the only other cause of action that survives in his Amended Complaint, Olivares claims that NASA violated the Privacy Act, 5 U.S.C. § 552a(a)(5), by improperly collecting and maintaining information about his alleged threats to co-workers, including an incident when he supposedly had a firearm at work. The first alleged violation is based on an affidavit made on June 20, 1990 by P. Christopher Schwartz, Olivares' one-time supervisor at Goddard. The affidavit in question was filed in response to an interview by an investigator compiling a report in connection with one of Olivares' EEO complaints. The affidavit, which as part of the investigative report is apparently maintained in the EEO office but not the Personnel Office, stated in pertinent part:

> "92. I had been pushing Ray Westcott to write up a report of the incident and he resisted doing so. I think Ray was fearful of Dennis. He said: "Dennis threatened me with a knife, and if you repeat that I will deny it." In fact, Pat Cudmore told me during this February 1989 timeframe, that Dennis had a gun and carried it in his briefcase."

The affidavit goes on to say, though Olivares does not cite it in his Amended Complaint:

> "93. I told John Rende that I could not get anything out of Westcott and asked him to document the knife incident that Ray had told me about."

The second claimed violation of the Privacy Act arose in connection with an incident on December 9, 1992. On that date, shortly after 3:00 p.m., a security guard at Goddard received an anonymous phone call suggesting that someone in Building 11 had "a handgun" and "the caller said something about Mr. Olivares". The incident/investigative report prepared in connection with the call indicates that guards promptly went to Mr. Olivares'

office, advised him that "a subject in Bldg. #·11 was supposed to have a handgun and we were not sure if the caller was stating Mr. Olivares was the one to have the gun or someone else". The report further indicates that Olivares consented to a search of his briefcase and desk and no weapon was located. The report goes on to say that Olivares believed the call was made because of his EEO lawsuits or perhaps because of his union activities. A two page written statement by Olivares, setting forth his views, was appended to the incident report.

Olivares alleges that NASA violated 5 U.S.C. § 552a(e)(2) in both cases because he was not contacted before the records were created. He alleges a violation of 5 U.S.C. § 552a(e)(5) because the records in both cases are false and inaccurate. Asserting its compliance with the Act, NASA seeks Summary Judgment as to the claims.

Again, with regard to the *Waters* claim, it is Olivares' burden to establish that: (1) NASA failed to elicit information directly from him "to the greatest extent practicable"; (2) its violation of the Act was "intentional or willful" and (3) the action had an "adverse effect" on him. The Court will assume for present purposes that whatever happened had an adverse effect on Olivares and will therefore confine its attention to the first two elements.

Focusing upon NASA's alleged failure to elicit information directly from Olivares, the inescapable logical truth is that NASA could hardly have had an obligation to contact Olivares *before* allegations concerning threatening behavior were made. Until such time as someone reports threatening behavior, there is, quite simply, no information to elicit from the individual. NASA's position with regard to the Schwartz memorandum, to illustrate, is that it was part of an investigative report and that copies of both the Schwartz affidavit and the Rende to Schwartz memorandum,

---

**7.** To date, Olivares and NASA are still apparently unable to agree about his educational credentials. NASA has asked Olivares to submit a copy of his degrees or transcripts and Olivares has refused to do so. In the EEO proceedings, Olivares' refusal to submit the requested verification · resulted in an adverse inference being drawn by

the Administrative Law Judge to the effect that Olivares in fact did not possess the degrees. The matter would seem resolvable if Olivares were simply to provide the requested data. If he chooses not to do so, then he has forfeited his sole remedy. Money damages in any amount, much less $410,000.00, are out of the question.

dated March 6, 1989, were furnished to Olivares. Olivares was given the opportunity to submit his own explanation as part of the investigative report and that he did. In other words, as soon as it was reported that Olivares had threatened a co-worker, he was directly contacted "to the greatest extent practicable".

Similarly, with regard to the gun-bearing incident, there was a report, Olivares was contacted and he was given an opportunity to provide information relative to the incident. That he did, both physically (by permitting a search of his belongings) and in writing (by submitting his own statement attached to the report). Whether or not the allegations concerning Olivares were in fact true, the point is that NASA was in no way remiss with regard to its collection of the information. As soon as the accusations were made, Olivares was contacted in an appropriate fashion and he responded. NASA violated no privacy law in gathering its information in this instance.

■ What remains is the claimed violation of 5 U.S.C. § 552a(e)(5), which requires an agency which maintains records used in making a determination about an individual to maintain such records "with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." As set forth in the Amended Complaint, the records that Olivares challenges as inaccurately maintained are (1) the Schwartz Affidavit (particularly paragraph 92), dated June 20, 1990 and (2) the Incident/Investigative Report entitled "Subject With a Gun", pertaining to the incident of December 9, 1992. Insisting that these records are false, that he has never threatened a co-employee or carried a gun, and that he has communicated his position to NASA, Olivares maintains that he is entitled to have the records amended and that NASA's failure to amend constitutes a violation of the Privacy Act. NASA's response is that it believes the challenged records to be accurate and, since it has not received any request pursuant to the Privacy Act to amend the records, that it has no reason to doubt their veracity.

The issue of accuracy aside, what is undeniably clear is that Olivares has failed to exhaust his administrative remedies for amending the records he believes are false. Paragraph (d)(2) of § 552a establishes an individual's right to request amendment of a record by setting a time-table for the agency's response and for it either to make the correction or to inform the individual of its refusal to do so. The statute also provides for agency review of a refusal to amend, ultimately setting the stage for judicial review of the agency's determination. In addition, the Code of Federal Regulations sets forth specific requirements for requesting amendment of NASA's records. *See* 14 C.F.R. 1212.300 *et seq.* For example, a request for amendment is required to have a notation on both the envelope and the letter that it is a "Request for Amendment of Individual Record under the Privacy Act". *See* 14 C.F.R. 1212.300(a). The notation is important since it triggers the time-line for processing appeals of adverse determinations.

■ More fundamentally, a civil remedy is available under the Privacy Act with regard to the maintenance of records only if the agency has made a determination "not to amend an individual's record in accordance with his request". § 552a(g)(1)(A). In other words, exhaustion of the administrative remedies provided in § 552a(d) of the Act is a prerequisite to bringing a civil suit to compel amendment of the record. *See, e.g. Nagel v. U.S. Department of Health, Education & Welfare,* 725 F.2d 1438 (D.C.Cir.1984); *See also Annotation, Exhaustion of Administrative Remedies as Prerequisite to Civil Action under § 3(g) of the Privacy Act (5 U.S.C. § 552a(g)),* 82 A.L.R. Fed. 698. Inasmuch as Olivares has never pursued his administrative remedy, it is incontrovertibly clear that NASA has in no way violated § 552a(e)(5) of the Privacy Act.

For all the recited reasons, Olivares' request for relief based on NASA's alleged violations of the Privacy Act must fail.

A separate Order will be entered granting NASA's Motion for Summary Judgment and denying Olivares' Cross-Motion.

## ORDER

Upon consideration of Defendant NASA's Motion to Dismiss and/or for Summary Judgment and Plaintiff Olivares' Cross–Motion for Summary Judgment, as well as the Oppositions thereto, it is for the reasons set forth in the accompanying Opinion, this 27th day of April, 1995

ORDERED, that Defendant NASA's Motion for Summary Judgment is hereby GRANTED: and it is

ORDERED, that Defendant NASA's Motion to Dismiss is hereby rendered MOOT; and it is hereby

ORDERED, that Plaintiff Olivares' Cross–Motion for Summary Judgment is hereby DENIED; and it is further

ORDERED, that Final Judgment is entered in favor of Defendant NASA and against Plaintiff Olivares, costs to be paid by Plaintiff Olivares.

## ORDER

Having read and considered Defendant's request to file its Opposition to Plaintiff's Cross Motion for Summary Judgment on April 5, 1994, it is this 24th day of April, 1995, United States District for the District of Maryland

ORDERED, that Defendant shall have through April 5, 1994 to file its Opposition to Plaintiff's Cross Motion for Summary Judgment and this Order shall be entered *Nunc Pro Tunc* on the docket of this Court.