**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DENNIS OLIVARES,
Plaintiff-Appellant,

v.

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION; DANIEL GOLDIN,
Administrator; LAWRENCE WATSON,
Chief Legal Counsel; ROGER JENKIN,
Personnel Director; BETTY BROCKI,
Personnel Management Specialist;
DONALD KRUEGER, Electrical
Engineering Division Chief; PATRICK
CHRIS SCHWARTZ; JOHN L. FERGUSON,

Labor Relations Officer; JANET
RUFF, Public Relations Chief;
CALVIN W. CURLEN, GESTA Union
Officer; HARVEY SAFREN, GESTA
Union Officer,
Defendants-Appellees,

and

OTHERS WHOSE IDENTITIES OR
LIABILITIES AT THIS TIME ARE UNKNOWN
TO THE PLAINTIFF AND THUS ARE HEREIN
DESIGNATED AS JOHN/JANE DOES,
Defendants.

No. 95-2343

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Peter J. Messitte, District Judge.
(CA-92-3439-PJM)

Argued: October 29, 1996

Decided: December 3, 1996

Before NIEMEYER, WILLIAMS, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Eric Robert Glitzenstein, MEYER & GLITZENSTEIN, Washington, D.C., for Appellant. Perry F. Sekus, Assistant United States Attorney, Baltimore, Maryland; Alice Lane Bodley, MARTIN, BODLEY & DRAFT, P.C., Washington, D.C., for Appellees. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Dennis Olivares appeals the district court's orders granting summary judgment to his employer, the National Aeronautics and Space Administration (NASA) and certain individuals employed at NASA. The underlying relevant facts are set forth in the district court's opinion and will not be repeated here. See Olivares v. NASA, 882 F. Supp. 1545 (D. Md. 1995).

Olivares' principal claim is that the National Aeronautics and Space Administration (NASA) violated his rights under the Privacy Act, 5 U.S.C. § 522a(e)(2)(1994) when it intentionally undertook a

2

"secret, highly damaging investigation" in 1989 into his academic background without collecting this information directly from him "to the greatest extent practicable." § 552a(e)(2).

To succeed on a Privacy Act claim, a plaintiff must establish that "(1) the agency failed to elicit information directly from him `to the greatest extent practicable,' 5 U.S.C. § 522a(e)(2); (2) the violation of the Act was `intentional or willful,' 5 U.S.C.§ 552a(g)(4); and (3) this action had an `adverse effect' on the plaintiff, 5 U.S.C. § 552a(g)(1)(D)." Waters v. Thornburgh , 888 F.2d 870, 872 (D.C. Cir. 1989).

NASA argues that it fulfilled its obligations under§ 522a(e)(2) and elicited information from Olivares to the "greatest extent practicable" in three ways: (1) by requiring him to file a standard government employment application, an SF-171, in 1987 when Olivares originally applied for work from NASA; (2) by relying on the results of an investigation, including a personal interview with Olivares, conducted by the Office of Personnel and Management (OPM), shortly after Olivares starting working at NASA in 1986; and (3) by relying on information which Olivares certified in twenty additional SF-171s he filed subsequent to his initial employment at NASA. In the SF-171, a government employee acknowledges "that all items contained herein may be subject to investigation prescribed by law" and consents "to the release of information concerning . . . capacity and fitness by employers, educational institutions, law enforcement agencies, and other individuals and agencies to duly accredited investigators."

When NASA hired Olivares in 1986, he stated on his SF-171 that he had been awarded both a B.S. in physics and a B.A. in philosophy from Loyola University, and masters and law degrees from George Washington University. Shortly thereafter, an investigator from the Office of Personnel Management (OPM) conducted a background investigation of Olivares and met with him. During that interview, Olivares explained that although he, in fact, completed a joint program at Loyola in physics and philosophy, his diploma was labeled "B.A. Philosophy" because Loyola demanded that graduating students designate only one field for listing on the diploma. In each of the SF-171s that Olivares subsequently filed, he similarly certified that he

3

had been awarded both a B.S. in physics and a B.A. in philosophy from Loyola University.

Contrary to NASA's suggestions, we do not believe that a government employee by consenting to a proper investigation of information provided in his initial employment application, i.e., the initial SF-171, necessarily provides his consent in perpetuity to government investigations of matters covered by the form. However, we agree with the district court that here "as a matter of law, NASA . . . contacted Olivares directly `to the greatest extent practicable.'" Olivares, 882 F. Supp. at 1550.

First, NASA, through OPM, conducted a personal interview with Olivares in 1987. At that interview, Olivares was given an opportunity to provide any additional information regarding his academic credentials. Second, as the district court noted, each of the SF-171s which Olivares filed subsequent to his initial date of employment in 1986 "contained its own consent to the agency to illicit information in connection with his educational credentials" and thus "constituted a new and separate authorization to verify" this information. Id.* As the district court further explained:

> The reality is that the official record of Olivares' degrees was inconsistent and confused from the beginning. Olivares swore in 1986 and on multiple occasions thereafter that he held a Bachelor of Science Degree in Physics and a Master's Degree in Political Science. The report of the first investigation in 1987 showed he did not hold those two degrees, whereas the report of Shirley Smith that same year showed that Olivares' Bachelor degree was in Political Science, not Philosophy as Olivares claimed, and that he did hold a Masters degree in Political Science from George Washington. Venturing upon these conflicting reports at a later time, for whatever reason, and given Olivares' repeated oaths on all

_____

* In his brief, Olivares argues that these subsequent SF-171s were filed after the 1989 investigation into his academic credentials and therefore cannot be "retroactively" applied to waive his rights. App. Brief at 42 n.19. The record before us, however, indicates that at least some of these SF-171s were filed prior to the agency's 1989 investigation.

4

subsequent SF-171's consistent with his original version, NASA could fairly undertake to clarify the matter directly with the educational institutions again and could do so without contacting Olivares.

Id.

Waters, 888 F.2d 870, upon which Olivares so heavily relies, is clearly distinguishable from the case at hand. An employee of the U.S. Department of Justice, Waters had asked for leave from his position to study for the Pennsylvania bar. After he returned to work, Waters again asked for leave to satisfy a summons for jury duty. When he did not return to work when scheduled, his supervisor, James Bennett, called the jury commissioner who informed him that Waters was still on jury duty, but that this duty had not started until eight days after his leave began. Unsatisfied with Waters' explanation when asked about this, Bennett again contacted the jury commissioner who informed him that Waters had asked her to certify his presence for jury duty during days in which her records indicated he was not present. Id. at 871-72.

Bennett then became suspicious of Waters' use of leave to take the bar exam. He asked Department personnel to contact the Pennsylvania Board of Law Examiners to confirm his attendance at the bar. After the Board requested, and the Department supplied, a written request for this information, the Board certified Waters' attendance at the bar. The district court found no violation of the Privacy Act, but the D.C. Circuit disagreed. Id. at 873. The court found that the Department should have gone first to Waters "for objective proof of his bar attendance, proof such as written correspondence informing him of his bar results, and his bar exam admittance ticket." Id. at 874.

In Waters, the Justice Department did not contact Waters directly before contacting the Pennsylvania Board. Id. at 874. Here, NASA did contact Olivares directly before contacting Loyola and George Washington University to verify his academic credentials. Both in the SF-171s as well as in the personal interview, Olivares was given an opportunity to provide information. In Waters, there was no basis for the Department's contention that it was merely attempting to verify information that Waters had already provided in a leave form. In con-

5

trast, the sole purpose of NASA's investigation was to verify the information that Olivares had provided in his initial SF-171, his subsequent SF-171s, as well as in his personal interview. By submitting an SF-171, an applicant is on notice that the information provided is subject to verification; the form clearly provides that "all items contained herein may be subject to investigation." By signing the SF-171, an applicant consents to the "release of information [from] educational institutions." A leave form contains no similar language, and therefore creates no similar expectation of verification.

The district court's recent opinion, Dong v. Smithsonian Institution, 1996 WL 636434 (D.D.C. 1996), is likewise distinguishable. There, the court found that the Hirshhorn Museum had not "to the greatest extent practicable" procured information from Dong when investigating rumors of an unauthorized trip by Dong in which she accompanied a piece of art to another museum. The court found that Hirshhorn officials had violated § 552a(e)(2) when they contacted personnel at the other museum before approaching Dong. As in Waters, the situation here is distinct in that information was collected from Olivares initially.

In addition to his § 552a(e)(2) claim, Olivares asserts that NASA violated § 552a(e)(5), which requires an agency that maintains records used in making a determination about an individual to maintain such records "with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." The district court properly rejected Olivares' claim for amendment of the records under § 552a(g)(2)(A) on the grounds that "Olivares has failed to exhaust his administrative remedies" with regard to this claim. Olivares , 882 F. Supp. at 1551-52. Similarly, the district court was correct to reject Olivares' damages claim under § 552a(g)(4) on the grounds that NASA did not intentionally or wilfully violate the Privacy Act in maintaining the challenged records.

Finally, in view of our holding, summary judgment was also properly granted on Olivares' state tort claims against employee union leaders for assertedly disseminating defamatory statements about him. Counsel for Olivares conceded at oral argument that if, as we have held, summary judgment was properly granted on Olivares' Privacy

6

Act claims, then there is no basis for federal jurisdiction on the related state tort claims.

<u>AFFIRMED</u>

7