**Keenan WILLIAMS, Plaintiff,**

v.

**James FARRIOR, et al., Defendants.**

No. 1:03cv519.

United States District Court, E.D. Virginia, Alexandria Division.

Sept. 7, 2004.

Keenan M. Williams, Petersburg, VA, pro se.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff, Keenan Williams, a federal inmate incarcerated at the Federal Corrections Complex in Petersburg, Virginia ("FCC Petersburg"), filed this *pro se Bivens* [1] action alleging that defendants [2] violated his due process and Privacy Act rights in their application of the Inmate Financial Responsibility Program ("IFRP"). Defendants responded to the complaint by filing a motion for summary judgment pursuant to Fed.R.Civ.P. 56. *Williams*, afforded ample opportunity to file responsive materials pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), submitted a response to defendants' motion for summary judgment.[3] At issue specifically are:

(1) whether prison officials' discretionary decisions pursuant to the IFRP impact a liberty interest such that due process is implicated,

---

1. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. In addition to naming the United States Bureau of Prisons ("BOP"), Williams also names as defendants the following FCC Petersburg employees: James Farrior ("Farrior"), Counselor; Fredy Wheeler ("Wheeler"), Counselor; Darryl Hooks ("Hooks"), Case Manager; Jeffrey George ("George"), Unit Manager; Christina Barglof ("Barglof"), Budget and Accounting Officer; Joseph Norwood ("Norwood"), Associate Warden; and Joseph Brooks ("Brooks"), Warden.

3. In his responsive materials, Williams conceded summary judgment in favor of James Farrior, Joseph Norwood, and Joseph Brooks. (Pl.'s Br. in Opp. at 4 (docket no. 28).)

or, more particularly in the context of the facts of this case,

whether defendants violated Williams' due process rights when, following Williams' failure to make a quarterly $25.00 payment toward his special assessment obligation, the defendants acted in accordance with the IFRP to place Williams on "refuse" status and conditioned removal of this status on payment in full of the remaining $125.00 balance of his special assessment obligation; and

(2) whether defendants violated the Privacy Act (i) where, as here, the defendants' discretionary decision to place Williams on "refuse" status was based on accurate data in the records and (ii) where, since the time of this discretionary decision, the BOP has acted to exempt the IFRP records from the Privacy Act.

For the reasons that follow, defendants' motion for summary judgment must be granted with respect to all defendants.

## I.

The record reflects the following undisputed facts. On November 4, 1999, Williams was convicted of two felonies in the United States District Court for the District of Columbia: (1) unlawful possession of a firearm and ammunition by a convicted felon, and (2) unlawful possession with intent to distribute fifty grams or more of cocaine base. Subsequently, Williams was sentenced to a total term of imprisonment of 135 months. In addition,

Williams was ordered to pay a total special assessment of $200.00, but no punitive fine was imposed. Ultimately, Williams was designated to serve his sentence at FCC Petersburg, where he arrived on January 20, 2000.

Inmates, such as Williams, typically arrive to serve their sentences at their designated United States Bureau of Prisons' ("BOP") facility with a variety of court-imposed financial obligations, including special assessments, restitution, and child support payments. To ensure that inmates fulfill these financial obligations, the BOP has developed the IFRP. Pursuant to this program, BOP officials establish payment plans for inmates to aid these inmates in satisfying their financial obligations. More specifically, once an inmate executes an IFRP contract agreeing to make a minimum payment of twenty-five dollars per quarter, BOP officials form a "unit team" which meets with the inmate at the commencement of his incarceration (or his first program review meeting) to establish a payment plan. Thereafter, the unit team holds regularly-scheduled program reviews during which the team determines whether the inmate has made sufficient progress towards fulfilling his financial obligations.[4] Based on the unit team's findings, an inmate may be asked to use funds from prison employment or contributions from outside sources to satisfy his financial obligations. See 28 C.F.R. §§ 542.10, 542.11; Program Statement 5380.07. Furthermore, if the unit team determines that the inmate is not making payments as required by his IFRP contract, the unit team has the discretion to

---

4. Specifically, at each program review meeting, the unit team

[(1)] determine[s] the total funds deposited into the inmate account for the previous six months; [(2)] subtract[s] the IFRP payments made by the inmate during the previous six months; and [(3)] subtract[s] $450 [for telephone service].

Furthermore, as the Program Statement implementing IFRP notes,

[a]ny money remaining after the [preceding] computation may be considered for IFRP payments, regardless of whether the money is in the inmate's trust fund or phone credit account.

place the inmate on "refuse" status, which, in turn, may result in a variety of adverse consequences to the inmate, including denial of furloughs and work details outside the facility. Once placed on "refuse" status, an inmate, seeking to change this status, must satisfy conditions set by the unit team to ensure compliance with the IFRP.

In this case, Williams voluntarily agreed to participate in IFRP and thus pay $25.00 per quarter to satisfy his obligation to pay the $200.00 court-ordered assessment. FCC Petersburg's Office of Financial Management processes these $25.00 payments during the last month of each quarter (December, March, June and September). These payments are timed to fall on the same day that the inmates' UNICOR[5] pay and Inmate Performance Pay is posted. In Williams' case, however, this did not occur because Williams was working in the FCC Petersburg commissary, which is not associated with either UNICOR or Inmate Performance Pay. Thus, Williams received his commissary payroll disbursements on a schedule that sometimes differed from the pay schedule for the majority of inmates employed at FCC Petersburg.

In June and September of 2001, Williams made the required $25.00 IFRP payment. However, on December 3, 2001, Williams had only $.72 in his account and he was therefore unable to make his $25.00 quarterly payment. This apparently occurred because Williams' commissary salary was not received in his inmate account until after the scheduled date for the IFRP deduction. The members of Williams' unit team appropriately exercised their discretion under the IFRP to refrain from placing Williams on "refuse" status for this event. Williams, thereafter, made his next-scheduled $25.00 payment in March 2002.

Significantly, Williams' inmate account balance never dipped below $294.00 during the period of April 3, 2002, to May 22, 2002. Yet, on June 5, 2002, the due date of Williams' third quarterly IFRP payment for·fiscal year 2002, Williams had a balance of only $.21 in his inmate account. Thus, Williams did not have funds on hand to make the June payment, despite having larger sums available in April and May. Accordingly, on June 16, 2002, the members of Williams' unit team exercised their discretion under the Program to place Williams on "refuse" status.

Williams' next program review meeting was scheduled for August 12, 2002. As required by BOP rules, Williams' unit team determined that in the six months prior to August 12, 2002, Williams had deposited approximately $1,700.00 into his inmate account. Because all funds in an inmate's account are available for use in paying relevant financial obligations, the unit team determined that Williams should be required to pay the remaining $125.00 balance of his court-ordered assessment in a single payment in order to end his "refuse" status. During this program review meeting, Williams, having received an explanation of the unit team's determination, executed a commissary form (similar to a money order) for the full amount of $125.00. Accordingly, Williams' status was immediately updated to "participates," and ultimately was modified to "completed."

Shortly thereafter, on August 16, 2002, Williams submitted an Inmate Request Form to FCC Petersburg Associate Warden Joe Norwood, disputing the method by which his unit team handled his payments, and seeking assistance in obtaining placement at a Federal Prison Camp. Norwood assigned the request to George, the Unit Manager, for response. In the interim, on

---

**5.** "UNICOR" is the commercial or "trade" name of Federal Prison Industries, Inc. *See* 28 C.F.R. § 345.11(a)(2003).

August 20, 2002, Williams submitted an Administrative Remedy Attempt at Informal Resolution questioning the change of his financial responsibility level from "average" to "poor" and demanding an explanation for the required full payment of the remaining $125.00 of his court-ordered assessment. In addition, Williams also requested a placement in a prison camp.

Wheeler and George met with Williams to discuss his concerns. They explained that Williams' financial responsibility level was altered because, although he had deposited approximately $1,700.00 into his inmate account during the preceding six months, he had failed to make sufficient progress in paying his court-ordered assessment. Furthermore, pursuant to the relevant BOP Program Statement formula, Williams had been asked to pay the balance of his court-ordered assessment because he had sufficient funds to cover the remaining balance of $125.00. Finally, addressing Williams' wish to be transferred to a prison camp, defendants Wheeler and George stated that Williams was ineligible for such a placement because his custody classification was too high as a result of a 1982 conviction for armed robbery. After further discussion, however, members of Williams' unit team determined that he should be given a camp placement notwithstanding the fact that his custody classification suggested that a medium security facility would be more appropriate. The unit team updated Williams' financial responsibility level, which had the concomitant effect of lowering Williams' security level. Subsequently, Williams was transferred to the Federal Prison Camp at Petersburg on September 19, 2002.

Williams filed the instant civil complaint on April 5, 2003. In Claim I, Williams asserts that his right to due process was violated when, on August 12, 2002, he was made to sign a commissary form in which he agreed to pay the remaining $125.00 owed for his court-ordered assessment in a one-time payment. Williams claims he was coerced into making this single payment by defendants' threats to terminate his prison employment and to prevent his potential placement in a prison camp. Furthermore, Williams contends that defendants violated the Due Process Clause by intentionally changing his IFRP status from "participates" to "refuse" in order to extract the $125.00 from his inmate account.

In Claim II, Williams alleges that, by changing his IFRP status, defendants also violated the Privacy Act. More specifically, Williams contends that defendants had an obligation to investigate the reason his quarterly IFRP deduction was not properly remitted on June 5, 2002, and that defendants failed to document the incident accurately. Williams further states that the changed IFRP status to "refuse" subjected him to a variety of adverse consequences. Finally, he contends that his status change was made willfully and intentionally because defendants chose to use the inaccurate record change of June 16, 2002.

As relief, Williams requests (i) an ex parte injunction ordering that he be transferred to an institution that allows him to receive vocational training; (ii) compensatory damages in excess of $50,000; and (iii) punitive damages in excess of $200,000. Defendants filed a motion for summary judgment on October 8, 2003, and Williams responded to that motion on November 10, 2003. For the reasons that follow, defendants' motion for summary judgment must be granted.

## II.

The principles governing disposition of summary judgment motions are well-established. In essence, summary judgment is appropriate only when there is no issue of material fact and the movant is entitled

to judgment as a matter of law. Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing a motion for summary judgment, the Court must view the facts in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Yet it is also true that the non-moving party, "may not rest upon mere allegations or denials ... but must set forth specific facts showing that there is a genuine issue [of material fact]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, to survive a motion for summary judgment, the non-moving party must come forward with evidence sufficient to establish the existence of every element essential to his case on which he bears the burden of proof at trial, even if the moving party presents no evidence. *Celotex,* 477 U.S. at 321–24, 106 S.Ct. 2548. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. A "mere scintilla" of evidence is not enough to defeat summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

These principles, applied here, compel summary judgment for the remaining defendants.

## III.·

### A. *Due Process Claim*

Williams' due process challenge is based on his unit team's request that he pay the $125.00 balance owed on his special assessment in a single payment. Specifically, he contends that this request constitutes an involuntary extraction of funds from his inmate account, thereby violating his constitutional right to due process. Moreover, Williams claims he complied with the request for full payment only on the basis of threats regarding his continued prison employment and his potential transfer to a prison camp. Because it clearly appears that Williams' unit team correctly applied the IFRP, Williams' claim amounts to a due process challenge to the program itself.

Although the Fourth Circuit has not squarely addressed this issue,[6] other circuits have considered and rejected due process challenges to the program.[7] Indeed some courts have rejected the precise due process argument presented here.[8]

---

6. The Fourth Circuit has consistently upheld the propriety of collecting fines and special assessments through the IFRP. *See, e.g., United States v. Espinoza–Cartagena,* 23 Fed.Appx. 187 (4th Cir.2002) (unpublished); *United States v. Walker,* 83 F.3d 94 (4th Cir.1996); *United States v. Francisco,* 35 F.3d 116, 122 (4th Cir.1994).

7. *See, e.g., Weinberger v. United States,* 268 F.3d 346, 361 n. 6 (6th Cir.2001); *Dorman v. Thornburgh,* 955 F.2d 57, 58–59 (D.C.Cir. 1992) (stating that discretion vested in prison officials to set conditions of prison employment precludes implication of a liberty interest deserving of due process protection); *Johnpoll v. Thornburgh,* 898 F.2d 849, 851 (2d Cir.1990); *James v. Quinlan,* 866 F.2d 627, 629 (3d Cir.1989).

8. Many courts have so held in unpublished opinions. *See, e.g., Todd v. United States,* No. 01–5146, 2001 WL 1606512, at *1 (D.C.Cir. Nov.20, 2001); *Grover v. Helman,* No. 97–2273, 1999 WL 191503, at *1 (7th Cir. Mar.25, 1999); *Solis v. Menifee,* No. 99 CIV. 9072 (GEL), 2000 WL 1401633, at *2 (S.D.N.Y. Sept 25, 2000) (rejecting inmate's claim of being coerced into IFRP participation by threats of IFRP "refuse" penalties); *Rivera v. United States,* No. 91–CR–595 KTD, 2000 WL 1277339, at *3 (S.D.N.Y. Sept.8, 2000) (same); *Solan v. Reno,* No. 99–1017, 1999 WL 605588, at *1–2 (E.D.Pa. Aug.9, 1999) (same).

Particularly instructive is *James v. Quinlan*, 866 F.2d 627 (3d Cir.1989), where plaintiffs, in circumstances essentially similar to those at bar, advanced the same argument Williams asserts. Specifically, plaintiffs in *James* claimed that they were unconstitutionally "faced with a choice of signing an authorization which gave prison officials the authority to take ... fifty percent of the moneys in their prison trust fund accounts attributable to their previous prison earnings, and apply it towards their financial obligations, or of losing their Federal Prison Industries job assignments." *Id.* at 629. The Third Circuit rejected this argument reasoning that plaintiffs lacked either a constitutionally protected property interest or liberty interest in their prison job assignments, and thus were not entitled to due process protections against threats to their prison jobs for failure to comply with the terms of the IFRP. *Id.* at 630. Moreover, the Third Circuit also noted that even assuming, *arguendo*, that plaintiffs had a protected interest in their prison employment (or wages), the IFRP was reasonably related to legitimate penological interests and, therefore, did not violate that interest. *Id.*

The Third Circuit's sound reasoning in *James* applies with equal force here. Williams has no cognizable liberty interest in any prison job assignment[9] or in placement in any particular prison facility.[10] Thus, Williams, like plaintiffs in *James*, is not entitled to due process protections against the threatened loss of any prison job or facility placement for failure to comply with the IFRP requirements. And moreover, even assuming some protected interests in prison employment or facility placement, enforcement of IFRP requirements is reasonably related to legitimate penological interests and, therefore, does not violate these interests.

In sum, where as here, BOP officials act in accordance with the IFRP, no due process violations occur. It follows, therefore, that Williams' due process claim is meritless[11] and defendants are entitled to summary judgment.

## B. *Privacy Act Claim*

Williams claims that on June 16, 2002, the BOP violated the Privacy Act when it incorrectly changed Williams' IFRP status from "participates" to "refuse." He contends further that this erroneous IFRP status continued until at least August 12, 2002, subjecting him to a variety of adverse consequences.

Pursuant to 5 U.S.C. § 552a(e)(5), the Privacy Act requires that an agency

"maintain all records which are used by the agency in making any determination about any individual with such accuracy ... as is reasonably necessary to assure fairness to the individual in the determination." 5 U.S.C. § 552a(e)(5).

---

9. *See James*, 866 F.2d at 630; *Cosco v. Uphoff*, 195 F.3d 1221, 1224 n. 3 (10th Cir. 1999) (noting that an inmate has no property interest in his or her prison job); *Miller v. Benson*, 51 F.3d 166, 170 (8th Cir.1995) (same).

10. *Williams v. Faulkner*, 837 F.2d 304, 309 (7th Cir.1988), *aff'd sub nom.*, *Neitzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (stating that prisoners have no protected interest in a particular housing assignment).

11. Given this conclusion, it is unnecessary to reach or decide defendants' further contention that they are entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (stating that an officer's claim for qualified immunity is subject to a two-step analysis, beginning with the threshold question of whether the facts alleged establish that the officers' conduct violated a constitutional right).

If an individual establishes that an agency utilized erroneous records in violation of this provision to make a determination "which is adverse to the individual," the individual may bring a civil action against the agency. *Id.* § 552a(g)(1)(C).

■ Importantly, however, the Privacy Act authorizes the head of certain agencies to promulgate rules exempting any system of records from the "accuracy" requirement of 5 U.S.C. § 552a(e)(5). *See* 5 U.S.C. § 552a(j). The BOP has done precisely this; in accordance with § 552a(j), BOP has exempted IFRP records from the "accuracy" requirement of the Privacy Act. *See* System of Records, 67 Fed.Reg. 31371–01 (2002); Implementation, 67 Fed. Reg. 51754–01 (2002) (codified at 28 C.F.R. §§ 16.97(j) & (k)(2003)); *White v. United States Prob. Office,* 148 F.3d 1124, 1125 (D.C.Cir.1998)(per curiam)(acknowledging that BOP inmate records systems are exempt from the amendment provision of the Privacy Act).[12] It follows, therefore, that Williams cannot assert any claim under the Privacy Act against BOP regarding the accuracy of his IFRP record. Nor is a different result required by the fact that the BOP acted to exempt IFRP records from the Privacy Act on August 9, 2002, approximately seven weeks after the unit team placed Williams on "refuse" status on June 16, 2002. Congress, by enacting § 552a(e)(5) did not grant Williams an irrevocable or vested right to assert a Privacy Act claim based on his IFRP records. To the contrary, Congress, at most, granted Williams an inchoate right to assert such a claim. Further, by specifically granting agencies, including the BOP, the power to exempt certain records from the Privacy Act, Congress conditioned any right Williams might have to assert a Privacy Act claim on whether the BOP exercises this power. And, when the BOP exercised this exemption power, any inchoate § 552a(e)(5) claim Williams may once have had was extinguished.[13] Put in the simplest terms, what Congress gave Congress can take away, which it did here by conferring on agencies the power to exempt certain records from the Privacy Act.[14]

Quite apart from this, even assuming that Williams is entitled to the benefit of § 552a(e)(5) with respect to his IFRP records, he has not and cannot point to any actionable inaccuracy in the maintenance of his IFRP records. In order to prevail in a § 552a(e)(5) cause of action, Williams, *inter alia,* must establish that BOP failed to maintain his IFRP records with the degree of accuracy necessary to assure

**12.** BOP maintains Williams' financial date, including his IFRP records, in the Inmate Central Records System. (Defs.' Mem. Supp. Summ. J. at 25). On August 9, 2002, BOP issued a final rule exempting the Inmate Central Records System from 5 U.S.C. §§ 552a(e)(1) & (e)(5). *See* 67 Fed.Reg. 51754–01 (2002) (codified at 28 C.F.R. §§ 16.97(j) & (k)(2003)).

**13.** *See Zeran v. America Online,* 129 F.3d 327, 335 (4th Cir.1997) (confirming principle that "[n]o person has a vested right in a nonfinal tort judgment, much less an unfiled tort claim"); *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,* 957 F.Supp. 1308, 1320–21 (S.D.N.Y.1997) (denying civil RICO claim, founded on securities fraud claims as RICO predicate acts, pursuant to RICO amendment eliminating securities fraud as a predicate act when claim arose before enactment of amendment but was filed three months after amendment became effective, and noting that, "[a] cause of action that has not been reduced to a final judgment is not a 'vested right.'").

**14.** A different result would obtain if Williams' inchoate cause of action had matured into a final judgment before the BOP acted to exempt its records from the Privacy Act. *See ABF Capital Mgmt.,* 957 F.Supp. at 1320–21; *see also Hyundai Merchant Marine Co. v. United States,* 888 F.Supp. 543, 551 (S.D.N.Y. 1995) ("A cause of action ... is inchoate and affords no definite or enforceable property right until reduced to final judgment.").

fairness in BOP's determinations.[15] This he cannot do for Williams admits, as he must, that on June 5, 2002, he had only $.21 in his inmate account and that this fact was accurately recorded in his IFRP records. Thus, Williams' IFRP records correctly reflected that on June 5, 2002, his inmate account lacked the necessary funds to make the $25.00 IFRP payment. This incontrovertible fact was a proper basis for the unit team's *discretionary* decision to change Williams' IFRP status. It is irrelevant, as Williams argues, that his account lacked sufficient funds only because his commissary salary was not posted until June 6, 2002. Regardless of when Williams' pay was posted, he had insufficient funds to cover the June 5, 2002, IFRP payment despite having deposited approximately $1,700.00 in his account during the preceding six months. Because there is no doubt that the BOP accurately maintained the records of Williams' IFRP participation status during the relevant time period, he cannot establish that the unit team's determination to place him on "refuse" status was based on inaccurate IFRP records, and therefore his Privacy Act claims must fail.

In truth, Williams complains of his unit team's *discretionary* decision to place him on "refuse" status. Yet, § 552a(e)(5) cannot be invoked to dispute a discretionary decision based on accurate records. And precisely this occurred here; defendants relied on accurate IFRP records in discretionarily placing Williams on "refuse" status. Thus, even assuming Williams' Privacy Act claim had not been extinguished, it would fail on the merits.

### IV. Conclusion

For the reasons stated above, defendants' motion for summary judgment must be granted with respect to all defendants. An appropriate Order will issue.

---

**15.** *See Deters v. United States Parole Comm'n,* 85 F.3d 655, 657 (D.C.Cir.1996) (stating the elements a plaintiff must establish to prevail in a § 552a(e)(5) cause of action); *see also*

*Olivares v. Nat'l Aeronautics & Space Admin.,* No. 95–2343, 1996 WL 690065, at *1 (4th Cir. Dec.3, 1996) (unpublished) (same).